TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN





ON REMAND









NO. 03-03-00374-CV






Jan Lubin, Gilberto Villanueva, Michael Paladino, Gerald Hooks, and 

Lesley K. Hooks, Appellants


v.


Farmers Group, Inc.; Farmers Underwriters Association; Fire Underwriters Association;
Farmers Insurance Exchange; Fire Insurance Exchange; Texas Farmers Insurance
Company; Mid-Century Insurance Company of Texas; Mid-Century Insurance Company;
Truck Insurance Exchange; Truck Underwriters Association; Farmers Texas County
Mutual Insurance Company; The State of Texas; Texas Department of Insurance; and
Texas Commissioner of Insurance, Appellees





FROM THE DISTRICT COURT OF TRAVIS COUNTY, 261ST JUDICIAL DISTRICT

NO. GV202501, HONORABLE SCOTT H. JENKINS, JUDGE PRESIDING





M E M O R A N D U M O P I N I O N


 The issue in this interlocutory appeal is whether the class action filed by the attorney
general in this case was properly certified. Under former article 21.21, section 17 of the insurance
code, the Department of Insurance (the "Department") may ask the attorney general to institute a
class-action lawsuit to recover from an insurer damages for injuries done to the insurance-buying
public. See former Tex. Ins. Code art. 21.21, § 17. (1) The district court concluded that the class could
be certified because all of the statutory prerequisites for certification listed in the former provisions
of the insurance code had been satisfied. On appeal, we originally concluded that the requirements
had not been complied with because, among other reasons, there were no class representatives
participating in the class action. Accordingly, we reversed the district court's certification order. 
Lubin v. Farmers Group, Inc., 157 S.W.3d 113 (Tex. App.--Austin 2005, pet. granted) ("Lubin I"). 
The case was appealed, and the supreme court determined that it was not necessary to recruit one or
more class representatives in class actions pursued by the attorney general at the request of the
Department. After reaching that conclusion, the supreme court remanded the case back to this Court
so that we could address whether, in light of the supreme court's determination, the requirements
for class certification had been met and to consider the parties' other issues that were not addressed
in our first opinion. Farmers Group, Inc. v. Lubin, 222 S.W.3d 417, 427-28 (Tex. 2007) ("Lubin
II"). On remand, we will affirm the order of the district court. 


STATUTORY FRAMEWORK

 Because it provides necessary context to the issues involved in this case, we briefly
summarize the statutory provisions at issue in this case. This case involves a class-action lawsuit
filed under former provisions of the insurance code. Class actions are procedural mechanisms used
"to increase judicial economy and efficiency for suits with parties too numerous for conventional
joinder." Citizens Ins. Co. of Am. v. Daccach, 217 S.W.3d 430, 449 (Tex. 2007); see General
Motors Corp. v. Bloyed, 916 S.W.2d 949, 952 (Tex. 1996) (explaining that class actions are designed
to allow numerous claimants with common complaints to obtain relief when it is not feasible for
claimants to obtain relief through multiple suits for damages). Moreover, they are "intended to
eliminate or reduce the threat of repetitive litigation, prevent inconsistent resolution of similar cases,
and provide an effective means of redress for individuals whose claims are too small to make it
economically viable to pursue them in independent actions." Daccach, 217 S.W.3d at 449-50; see
also id. at 450 (stating that "class actions provide no greater substantive rights than other procedural
mechanisms of litigation").

 Former provisions of the insurance code authorized the filing of class actions when
a member "of the insurance buying public has been damaged by an unlawful method, act, or
practice." Former Tex. Ins. Code art. 21.21, § 17. Further, the code allowed a class action to be filed
by two distinct parties: "the individual damaged" or the attorney general at the request of the
Department. Id. 

 The former insurance code provisions also stated that to maintain a class action under
the insurance code, the following four prerequisites necessary for typical class actions must be met:
numerosity, commonality, typicality, and adequacy of protection. Id. § 18; see Bloyed, 916 S.W.2d
at 953-55 (explaining that prerequisites are designed to protect absent class members and ensure
that actions taken on their behalf actually serve their interests). In particular, the code provided as follows:

The court shall permit one or more members of a class to sue or be sued as
representative parties on behalf of the class only if:


(1) the class is so numerous that joinder of all members is impracticable;


(2) there are questions of law or fact common to the class;


(3) the claims or defenses of the representative parties are typical of the claims or
defenses of the class; and


(4) the representative parties will fairly and adequately protect the interests of the
class.


Former Tex. Ins. Code art. 21.21, § 18(a). 

 In addition to these prerequisites, the former insurance code provisions specified that
a class "action may be maintained" only if at least one of three other additional requirements was
also satisfied. Id. § 18(b). The condition relevant to this case (predominance) provided that a class
action can be certified if the four prerequisites listed above are met and if "the court finds that the
questions of law or fact common to the members of the class predominate over any questions
affecting only individual members and that a class action is superior to other available methods for
the fair and efficient adjudication of the controversy." Id. § 18(b)(3) (also listing factors for court
to consider when deciding whether predominance requirement was met). (2) 





BACKGROUND

 In late 2001, Farmers (3) stopped offering HO-B (all-risk) homeowners policies and
began offering HO-A (stated-peril) homeowners policies. The new policies limited coverage for
water damage and eliminated mold coverage. Various policyholders complained that the new
policies offered reduced coverage at unfair rates. 

 After receiving these complaints, the Department investigated and discovered that
even with the reduced coverage, Farmers' premiums had in fact increased. See Tex. Ins. Code Ann.
§§ 401.051, .052, .054 (West 2009) (authorizing Department to investigate insurers' records on
recurring basis). In late 2001, the attorney general opened his own investigation into Farmers'
practices, and the Department referred its investigation to the attorney general. As part of his
inquiry, the attorney general sent Farmers various civil investigative demands, requesting
information about Farmers' business practices. See Tex. Bus. & Com. Code Ann. § 17.61
(West Supp. 2008) (explaining that if attorney general believes that individual is in possession of
information relevant to investigation of violation of Deceptive Trade Practices Act, he may demand
that individual produce documents and allow inspection of documents). After finishing his
investigation, in August 2002, the attorney general sued Farmers. (4) The suit alleged that Farmers had
engaged in various improper and discriminatory actions. 

 First, the attorney general alleged that despite the fact that the new HO-A policies
Farmers was offering provided less coverage than its former HO-B policies, Farmers was charging
more for the HO-A policies than it had for its HO-B policies. 

 Second, the attorney general argued that some of the factors used to determine a
policyholder's premium (e.g., credit history and age of a home) resulted in over- and undercharges. 
For example, the attorney general argued that Farmers was improperly using policyholders' credit
histories when calculating premiums. Specifically, he alleged that after Farmers obtained a
policyholder's credit history, it would assign the policyholder to a risk-assessment category in order
to determine the policyholder's premium. (5) Further, the attorney general asserted that Farmers did
not inform its policyholders regarding its decision to use their credit histories when making premium
determinations or the manner in which their credit histories affected their premiums. In other words,
the attorney general argued that Farmers was not notifying or was inadequately notifying its
policyholders that their premiums were being increased due to their credit information. Moreover,
the attorney general contended that Farmers' use of the credit histories was inconsistent, resulting
in individuals with similar loss histories paying significantly different premiums. 

 In addition to challenging the use of credit information, the attorney general also
criticized the discounts Farmers gave based on the age of a policyholder's home. Essentially,
Farmers was using the age of a policyholder's home to assess the probability of a claim being made,
but the attorney general contended that the discounts calculated were not consistent with the actual
loss histories for homes. 

 In a related assertion, the attorney general argued that in addition to improperly using
various factors when determining its HO-A premium rates, Farmers' premium calculations failed
to take into account the geographical location of its policyholders' homes. Specifically, the attorney
general contended that although the new HO-A policies limited the coverage for water damage and
eliminated mold coverage, the reduction in coverage affected policyholders differently depending
on whether they lived in regions that were likely or unlikely to have water or mold claims. Further,
the attorney general contended that rather than tailoring HO-A premiums to reflect those differences,
Farmers simply applied a uniform multiplier to calculate the change in the cost of the new policies. 

 Third, the attorney general objected to various fees that Farmers was charging. 
Farmers was providing insurance through a reciprocal exchange in which the participating insurance
companies spread the risk of loss among themselves. Farmers Group, Inc. was operating the
exchange, and for this service, it charged management fees. The amount of the fee was based upon
the amount of premiums collected by the insurance companies. In light of this exchange system, the
attorney general argued that Farmers failed to satisfy its fiduciary duties to its policyholders by
failing to notify them:

(a) [of its] decision to enter into a management-fee agreement based on percentage
of premium collected [in a manner that] benefits Farmers . . . to the detriment of the
Exchanges and the policyholders; (b) what the terms of the management-fee
agreement actually are; (c) any possible adverse impact on premiums the
management fee creates; and (d) that Farmers . . . is in fact making more money
through management fees as premiums increase. 



 Finally, some time after beginning his initial investigation into Farmers' practices
concerning home insurance policies, the attorney general also challenged Farmers' decision to use 
policyholders' credit histories when determining premiums for its automobile policies. Similar to
the complaints regarding home policies, the attorney general asserted that Farmers assigned
automobile policyholders to risk-assessment groups based on their credit histories but did not
disclose the effect that a policyholder's credit history had on the premium that the policyholder was
ultimately charged for automobile coverage. (6) In other words, the attorney general alleged that
Farmers was not disclosing or was inadequately disclosing when a policyholder's credit history
resulted in higher premiums. As a result of this allegation, several new insurers were added to
the suit. 

 Around the time that the attorney general filed suit, the Department initiated an
administrative proceeding against Farmers, and the Commissioner of Insurance ("Commissioner")
issued a cease-and-desist order against Farmers, requiring Farmers to quickly change its rating
practices. Contemporaneously, Farmers informed its policyholders that it would not be renewing
its homeowners insurance policies and told its agents that it would not be accepting any new
business in Texas. 

 Shortly thereafter, the attorney general, the Department, and Farmers all participated
in various negotiations regarding the claims made by the attorney general and Farmers' decision to
leave the Texas market. On November 30, 2002, the attorney general entered into a Memorandum
of Understanding ("Memorandum") (7) with Farmers, settling the Department's administrative
proceeding and the attorney general's investigation and suit and setting forth the terms of a proposed
"global settlement." As part of the proposed settlement, the attorney general agreed to amend his
pleadings in order to change the suit into a settlement class action.

 The Memorandum specified that the "intent and spirit" of the proposed settlement
agreement was to "terminate all of the disputes" and to permit Farmers "to continue to provide
insurance in the Texas market." In other words, the proposed agreement was a universal release in
which the class members agreed to release Farmers from "all existing, known and unknown claims,
demands or causes of action . . . whether pending or threatened, suspected or unsuspected, contingent
or non-contingent, for all existing, known and unknown damages and remedies that arise out of or
relate to the acts and/or occurrences alleged in the" lawsuit regarding homeowners insurance. 
Effectively, the agreement released Farmers from all claims resulting from excessive premiums
charged and from Farmers' decision to no longer provide HO-B policies and to substitute HO-A
policies for the HO-B policies. The release regarding automobile insurance claims was more limited
and only released claims relating to "the disclosure or nondisclosure of consumer credit information
or the disclosure or nondisclosure of the use or effect of using consumer credit information." 

 Under the Memorandum, Farmers was required to make various reductions to the
premiums it charges and to set up a fund to compensate the class members. First, Farmers agreed
to immediately reduce its homeowners insurance base-premium rates by 6.8% and to refrain from
increasing those rates for a specified period of time. The reduction was to be applied prospectively
to any existing HO-A policy that was renewed or to any new policy issued. In addition, under the
agreement, the reduction was also to be applied retrospectively to HO-A policies issued before the
date the Memorandum was agreed to. In other words, individuals who had purchased an HO-A
policy before the agreement was proposed were entitled to relief in the form of a refund. For
individuals still covered by an HO-A policy, the refund will be given as a credit. For individuals
who no longer have policies with Farmers, the refund will be given by check. Because the
prospective and retrospective relief was tied to the allegedly high homeowners-insurance-premium
rates that Farmers began charging after it stopped offering its HO-B policies, recovery was limited
to those individuals who had purchased an HO-A policy before or after the agreement was proposed:
individuals who did not purchase an HO-A policy after their HO-B policies were discontinued will
not receive either type of recovery. 

 Second, in addition to these general reductions, Farmers also agreed to give additional 
reductions to qualifying policyholders. As mentioned previously, the attorney general objected to
the manner in which Farmers used certain information to determine its policyholders' premiums both
before and after Farmers discontinued its HO-B policies. For example, the attorney general alleged
that Farmers was using its policyholders' credit histories and the ages of their homes in a manner that
led to inconsistent premium rates. Further, the attorney general objected to Farmers' decision to not
adjust its premium rates to account for the differences in the risk of loss resulting from the
geographical locations of its policyholders' homes. As part of the proposed settlement, Farmers
developed new methods for determining premium adjustments based on the credit histories of its
policyholders, the ages of their homes, and the geographical locations of their homes. Those new
methods were submitted to the Department for approval to ensure that the new methods accurately
reflected true insurability differences. 

 Under the new methodology, various policyholders would be entitled to discounts to
their premiums. As with the flat-rate-premium reduction, Farmers agreed to apply the individual
discounts prospectively and retrospectively. Regarding retrospective recovery, if policyholders paid
premiums that exceeded what they would have been required to pay had Farmers employed the
agreed discounts at the time the policies were issued, they were entitled to a complete (100%) refund
of that difference. However, if a policyholder paid less under the old system than he would have had
the new standards been in effect at the time his policy went into effect, the policyholder was
obviously not entitled to a refund but also was not required to pay for the benefit that he had
previously received. Individuals who had purchased insurance policies within a few years of the
effective date of the Memorandum were entitled to recover. Because the recovery period included
years in which HO-B policies were still being issued, relief was not strictly limited to individuals
who had purchased HO-A policies, meaning that recovery for overcharges extended to HO-B
policyholders who were insured during the recovery period listed in the agreement even if they had
never purchased HO-A policies. Those individuals still insured under an HO-A policy will be given
a credit towards their premiums, and the other individuals entitled to relief will receive the refund
via a check from Farmers. 

 Finally, under the proposed settlement, Farmers agreed to reimburse individuals who
were charged higher premiums due to mistakes in their credit reports. In particular, Farmers agreed
to reimburse policyholders for "any overcharges that may have occurred to homeowners or
automobile insurance policyholders . . . who paid a premium . . . that would have been less, but for
erroneous credit information." In other words, the policyholders were entitled to completely recover
the difference between what they paid and what they would have paid had Farmers used their correct
credit information when calculating premiums. As with the individualized discounts, the credit
refund applied to policies in effect before and after Farmers discontinued its HO-B policies, meaning
that HO-B policyholders were also entitled to recovery. Unlike the other types of recovery listed
above, this relief was available to automobile insurance policyholders as well as homeowners
insurance policyholders. 

 In light of the preceding, the Memorandum established the following settlement
classes: the "Rate Class," the "Discount Class," and the "Credit Usage Notice Class." The Rate
Class was composed of all of the policyholders who were informed that their HO-B policies would
not be renewed: that group included all of the individuals entitled to the prospective or retrospective
HO-A premium-rate reductions. The Discount Class consisted of all of the homeowners insurance
policyholders who were eligible to receive the individual discounts or refunds discussed previously. 
Finally, the Credit Usage Notice Class comprised the homeowners or automobile insurance
policyholders who were entitled to receive a refund due to Farmers' use of erroneous credit
information. (8) Under these classifications, an individual policyholder may be a member of more than
one subclass and, therefore, be entitled to more than one type of recovery. 

 In addition to listing these components of the settlement, the Memorandum stated that
it "is not feasible to calculate in advance the amount, if any, to be paid to each class member"
because the amounts "require individualized calculations." For the most part, the recovery will
depend on an examination of Farmers' records. Although the exact value of the settlement was not
established, the Memorandum provided an estimate for the value of the settlement as $117,500,000. 
Notably, as discussed previously, Farmers agreed to pay or credit "100% of any premium differential
resulting from the" individualized discount calculations and the credit refunds. In other words,
Farmers agreed to provide whatever funds were necessary to ensure that policyholders obtained the
full benefit of the individualized discounts and the credit refunds. 

 Under the terms of the agreement, $2 million will be given to the State for attorneys'
fees and costs to the State, and the Memorandum stated that members of any of the subclasses
described above may elect to opt out of the class action by submitting "a timely written request for
exclusion." Moreover, the Memorandum specified that if more than two percent of the policyholders
chose to opt out of the class action, Farmers or the attorney general may terminate the
settlement class action. 

 In December 2002, as required by the Memorandum, the attorney general filed an
amended petition that added a class-action component. The amended petition added the automobile
insurance claims described earlier and additional insurance companies and stated that it was filed
"in the name of the State of Texas . . . and on behalf of the Commissioner . . ., the Department . . .,
and certain classes of Texas homeowners and automobile insureds." (9) Further, the petition stated,
"At the request of the Commissioner and in the public interest, the State, by and through the
Attorney General, brings these claims as a class action . . . on behalf of the Settlement Classes." 
Additionally, the petition incorporated the definitions for the Rate Class, the Discount Class, and the
Credit Usage Notice Class listed in the Memorandum and described previously. The petition also
alleged that the "prerequisites to maintaining a class action" had been met. (10) In addition to the
petition, the attorney general filed the Memorandum as a proposed settlement agreement, a motion
for settlement class certification, and a proposed notice to be sent to the class members. 

 Shortly before the attorney general filed his amended pleading, various policyholders
objected and intervened in the case. Those policyholders were Jan Lubin, Gilberto Villanueva,
Michael Paladino, Gerald Hooks, and Lesley K. Hooks (cumulatively the "Policyholders"). 
Although all five of the Policyholders intervened, they did so in groups and have divided themselves
into two groups for the purpose of appeal. Jan Lubin, Gilberto Villanueva, and Michael Paladino
constitute the first group, and Gerald Hooks and Lesley K. Hooks comprise the other group. When
necessary to refer to issues raised solely by one of the groups, we will refer to the first group as
"Lubin" and to the second group as "the Hookses." 


 Villanueva and Paladino had previously filed their own class actions against several
of the companies that are appellees in this case. (11) The Hookses were members of another class-action suit filed by Sandra Geter. That suit was filed on behalf of the individuals whose HO-B
policies had been nonrenewed by Farmers. For that reason, the class in the Geter class action was
composed of the same individuals that make up the Rate Class at issue in this case.

 The district court conducted a lengthy hearing on the class-certification issue and
heard testimony from several witnesses. See former Tex. Ins. Code art. 21.21, § 18(g) (requiring
court approval before class action may be settled). In June 2003, the court signed an "Order of
Preliminary Approval," finding that the attorney general could bring the class action. (12) 
The court found that the numerosity, typicality, commonality, and adequacy prerequisites had been
met, that the common questions of law and fact were predominant, and that pursuing the claims in
this case through a class-action format was superior to other available methods. (13) Accordingly, the
court preliminarily approved the settlement. (14) 

 The Policyholders brought this interlocutory appeal. See Tex. Ins. Code Ann.
§ 541.259 (West 2009) (authorizing interlocutory appeals of certification orders). On appeal, among
other claims, the Policyholders asserted that the class action did not satisfy all of the necessary
prerequisites. The attorney general disagreed. Essentially, he argued that the former provisions of
the insurance code set up two types of class actions: ones filed by the attorney general and ones filed
by injured parties. See former Tex. Ins. Code art. 21.21, § 17. Further, he contended that class
actions filed by the attorney general do not have to strictly comply with all of the statutory
prerequisites. Id. § 18 (listing prerequisites for filing class action). 

 This Court disagreed with the attorney general's assertions and concluded that he
must comply with all of the prerequisites in order to maintain a class action. Lubin I, 157 S.W.3d
at 127. Further, we determined that the attorney general had "not shown that the State has suffered
an injury similar to those suffered by the class members and thus has not shown that he may act as
the class representative himself." Id. Moreover, we concluded that because the attorney general
cannot act as a class representative and because the attorney general had failed to appoint a class
representative, some of the necessary prerequisites for class certification (e.g., typicality and
adequacy) were not satisfied. Id. at 129. 

 The attorney general appealed our determination to the supreme court. Although the
supreme court agreed that the attorney general had to comply with the prerequisites for class
certification, it also determined that for class actions brought by the attorney general, the class-action
requirements "must be applied generally to the claims asserted by the" attorney general, rather than
to the attorney general himself. Lubin II, 222 S.W.3d at 420. In making this determination, the
supreme court noted that the insurance code "appears to authorize attorneys general to file suit in
their own right, rather than merely acting as counsel for private citizens." Id. at 424. Accordingly,
the supreme court concluded that it was not necessary for the attorney general to "recruit one or more
policyholders as representatives." Id. 

 To the contrary, the supreme court noted that the attorney general's duty is to
"represent the state" and that requiring him to recruit individual representatives "would inevitably
restrict the 'broad discretionary power' attorneys general need to carry out their constitutional
duties." Id. at 425 (quoting Terrazas v. Ramirez, 829 S.W.2d 712, 721 (Tex. 1991)). In other words,
the supreme court determined that the absence of a class representative in these types of cases will
not, on its own, prohibit the class actions from being certified. 

 After concluding that the insurance code authorized the attorney general to file a class
action in his "own right," the supreme court then remanded the case to this Court to address whether
the requirements for class certification were met in light of the supreme court's new directive and
to address the other issues raised but not addressed in our prior opinion. Id. at 427-28. 


STANDARD OF REVIEW

 A trial court must conduct a rigorous analysis before ruling on a class certification
in order to ensure that the prerequisites have been met. Compaq Computer Corp. v. Lapray,
135 S.W.3d 657, 663 (Tex. 2004); see also McAllen Med. Ctr., Inc. v. Cortez, 66 S.W.3d 227, 232
(Tex. 2001) (explaining that courts have rejected concept that they are to certify first and determine
compliance later). In addition, courts use heightened scrutiny when reviewing settlement class
actions. McAllen Med. Ctr., Inc., 66 S.W.3d at 232. This heightened scrutiny is employed in order
to "protect absent class members" from the possibility that their claims may be settled in a manner
that is inconsistent with their best interests. Id. at 232-33; see Bloyed, 916 S.W.2d at 953-54. (15) The
elevated review is applied to the following class-action requirements: typicality, adequacy, and
predominance. McAllen Med. Ctr., Inc., 66 S.W.3d at 232-33. 

 We review a trial court's preliminary order to certify a class for an abuse of discretion. 
Southwestern Ref. Co. v. Bernal, 22 S.W.3d 425, 433 (Tex. 2000); see Bloyed, 916 S.W.2d at 955;
see also Farmers Ins. Exch. v. Leonard, 125 S.W.3d 55, 60 (Tex. App.--Austin 2003, pet. denied)
(explaining that trial courts are given broad discretion when determining whether to certify class). 
A trial court abuses its discretion when ruling on a class certification if it does not properly apply the
law to the undisputed facts, if it acts unreasonably or arbitrarily, or if it rules "upon factual assertions
not supported by the record." State Indus., Inc. v. Fain, 38 S.W.3d 167, 169 (Tex. App.--Waco
2000, pet. denied). Although certifications are reviewed for an abuse of discretion, not every
presumption will be made in favor of the trial court's ruling. Henry Schein, Inc. v. Stromboe,
102 S.W.3d 675, 691 (Tex. 2002). Compliance with the class-certification requirements must be
demonstrated and not presumed, but appellate courts should give the benefit of the doubt to the trial
court's determinations regarding credibility of witnesses and other similar issues. Id.; see Lapray,
135 S.W.3d at 671. 


DISCUSSION: LUBIN'S CLAIMS

 On appeal, two sets of policyholders, Lubin and the Hookses, contest the propriety
of the district court's decision to approve the certification in this case. We will address Lubin's
claims first and then turn to the Hookses' assertions. First, Lubin argues that the district court
abused its discretion by certifying the class action because the requirements of the insurance code
were not met. In addition, Lubin contends that the former insurance code provisions do not empower
the attorney general to pursue the types of claims forming the foundation of this class action. We
will address those issues in the order listed. 


Class Action Requirements 

 As mentioned previously, the district court concluded that the four prerequisites to
class certification (numerosity, commonality, typicality, and adequacy) were satisfied and further
concluded that one of the additional necessary statutory elements was also satisfied. See former Tex.
Ins. Code art. 21.21 § 18. Specifically, regarding the additional element, the court determined that
"the questions of law or fact common to the Settlement Classes predominate over any questions
affecting only individual members" and that "certifying this Action as a class action is superior to
other available methods for the fair and efficient adjudication of the controversy." The Policyholders
contend that the district court abused its discretion by concluding that the five elements had been
met. In light of the supreme court's directive, we must determine whether the claims asserted
generally satisfy the class-action requirements. 

 In resolving the issues presented on appeal, we must keep in mind that what is being
reviewed in this case is the district court's decision to certify the class. The district court's decision
to preliminarily approve the settlement as part of the certification process "has no binding force." 
McAllen Med. Ctr., Inc., 66 S.W.3d at 234. In other words, the preliminary certification of a
settlement class action simply means that the class action may proceed, and the certification does not
address the fairness or adequacy of a proposed settlement. Cf. Eisen v. Carlisle & Jacquelin,
417 U.S. 156, 178 (1974) (explaining that certification component of class action concerns whether
requirements for class action have been satisfied, not merits of claims presented); see also Tex. Ins.
Code Ann. § 541.257(c) (West 2009) (instructing courts to use federal decisions for guidance in
construing class-action provisions of insurance code). In fact, the settlement does not obtain a legal
effect until the final approval in a fairness hearing. McAllen Med. Ctr., Inc., 66 S.W.3d at 234. It
is during a fairness hearing that district courts must thoroughly examine the terms of the settlement
in order to see if the settlement is fair. Id.; see Tex. R. Civ. P. 42(e) (allowing court to approve
settlement that binds class members "only after a hearing and on finding that the settlement . . . is
fair, reasonable, and adequate"). 


Numerosity

 The numerosity requirement is not disputed. Both the Policyholders and Farmers
acknowledge that the proposed settlement will apply to hundreds of thousands, if not millions, of
individuals who either have or used to have insurance coverage through Farmers. Accordingly, we
cannot conclude that the district court abused its discretion by determining that the numerosity
requirement had been met. 




Commonality

 The commonality requirement is also not highly disputed. Moreover, the threshold
for satisfying the commonality requirement is not high. Graebel/Houston Movers, Inc. v. Chastain,
26 S.W.3d 24, 33 (Tex. App.--Houston [1st Dist.] 2000, pet. dism'd w.o.j.). In order to satisfy the
commonality requirement, it is not necessary that all or even most of the questions of law or fact be
common to the class. Employers Cas. Co. v. Texas Ass'n of Sch. Bds. Workers' Comp. Self Ins.
Fund, 886 S.W.2d 470, 474 (Tex. App.--Austin 1994, writ dism'd w.o.j.). Rather, all that is
required is that there be questions of law or fact common to the class. Tex. R. Civ. P. 42(a)(2); see
also E & V Slack, Inc. v. Shell Oil Co., 969 S.W.2d 565, 569 (Tex. App.--Austin 1998, no pet.)
(explaining that questions are common to class if answer to one class member is answer to all
class members). 

 As described earlier, there are three proposed subclasses involved in this class action. 
The Rate Class members share the common issue of whether Farmers was charging HO-A
policyholders premium rates that were too high for the coverage provided through their policies. 
Similarly, the Discount Class members share the issue of whether the manner in which Farmers
determined premiums led to inequitable and discriminatory results. Specifically, the class members
share the issues of whether Farmers was using its policyholders' credit information and the age of
their homes in a discriminatory manner and whether Farmers' decision to apply a standard-rate
reduction to its HO-A policy premiums was improper. Finally, the Credit Usage Notice Class
members share the common issue of whether Farmers was properly informing its policyholders when
they were charged higher premiums due to their credit histories. 

 In light of the preceding, we cannot conclude that the district court abused its
discretion by determining that there were common issues shared by the members of the subclasses. 


Typicality and Adequacy 

 In her briefs, Lubin lists several sets of arguments for why she believes the adequacy
element has not been satisfied and then generally asserts that the typicality element is not satisfied
for the same reasons discussed in the "adequacy" portion of her briefs. See Bloyed, 916 S.W.2d at
953 (explaining that due process requires "adequate representation of the interests of absentee class
members" because class actions are binding on all class members). For this reason and because the
typicality and adequacy elements are closely related, we will address the two elements together. (16) 
See Forsyth v. Lake LBJ Inv. Corp., 903 S.W.2d 146, 150 n.6 (Tex. App.--Austin 1995, writ dism'd
w.o.j.) (consolidating elements for purpose of discussion due to their "analytical overlap"); see also
Employers Cas. Co., 886 S.W.2d at 475 (explaining that typicality and adequacy analyses employ
similar considerations). (17) 

 In her first set of arguments, Lubin contends that there are several conflicts among
the various subclasses and between the attorney general and the class as a whole that prevent either
the adequacy or the typicality elements from being satisfied. In particular, Lubin alleges that there
are conflicts present within the following paired groups of individuals that should have prohibited
certification of this class action: individuals who purchased HO-A policies and those who did not,
individuals who were insured under an HO-A policy at the time of settlement and those who let their
policies expire, individuals who will benefit under the new discount methodology adopted by
Farmers and those who will pay more after the methods are used, the attorney general and the class,
and those individuals who want the class to be certified and those who do not. Alternatively, Lubin
argues that the typicality and adequacy elements were not met because the attorney general did not
and cannot vigorously protect the class members' interests. 


 Conflicts

 As mentioned above, Lubin contends that there are fatal conflicts present within
various groups involved in the class action that should have prevented certification. When
determining whether the requirements for this type of class action have been satisfied, courts should
examine whether there exists antagonism among the class members or between the attorney general
and the class members. Cf. E & V Slack, Inc., 969 S.W.2d at 568 (explaining that court should
consider presence of antagonism in private class actions); Forsyth, 903 S.W.2d at 150 (same). In
other words, courts should consider potential conflicts of interest. See Forsyth, 903 S.W.2d at 150. 
However, mere speculation regarding potential conflicts is insufficient to negate an adequacy
finding. Employers Cas. Co., 886 S.W.2d at 476. Moreover, only conflicts going to the heart of the
litigation will defeat the adequacy of representation. See Phillips Petroleum Co. v. Bowden,
108 S.W.3d 385, 399 (Tex. App.--Houston [14th Dist.] 2003), rev'd in part on other grounds,
247 S.W.3d 690 (Tex. 2008). 


 HO-A Policyholders and Non-Policyholders

 Regarding the first alleged conflict, Lubin contends that the proposed settlement
creates a conflict "between class members who purchased HO-A policies and those who did not." 
In making this argument, Lubin asserts that the prospective and the retrospective rate reductions
described in the proposed settlement will only be given to "policyholders who were insured under
an HO-A policy issued by" Farmers. For this reason, Lubin argues that members of the Rate Class
who were notified that their HO-B policies would not be renewed but did not purchase an HO-A
policy will not receive any benefit from either type of reduction listed in the agreement.

 It is true that, under the proposed settlement, individuals who did not purchase HO-A
policies will not receive refunds for overpayments of HO-A premiums, but Lubin's argument that
this type of differential recovery creates a fatal conflict ignores the foundation of this class action. 
This class action was initiated, at least in part, by allegations that Farmers was charging too much
for its new HO-A policies given the limited coverage that the policies provided. Unlike for HO-A
policies, no allegation was made that Farmers was universally charging HO-B premiums that were
too high. For these reasons, individuals who did not purchase an HO-A policy through Farmers did
not suffer the particular injury alleged. Accordingly, the proposed settlement did not authorize them
to receive the benefit of the prospective and retrospective relief related to HO-A policies. This type
of distinction does not seem to be the type of antagonism that justifiably prevents certification. 

 Moreover, class members who did not purchase HO-A policies may still be entitled
to some recovery under the settlement. As discussed previously, the attorney general alleged that
Farmers was charging certain individuals premiums that were too high because the methods Farmers
used for determining premiums did not accurately take into account individualized risks. Further,
some of the allegedly improper methods (discriminatory use of credit histories and age of
policyholders' homes) occurred while Farmers was still offering its HO-B policies. For that reason,
under the settlement, Farmers agreed to adopt the agreed-upon discounts discussed previously and
agreed to compensate current and former HO-A policyholders and former HO-B policyholders
provided that they paid premiums that were higher than what they would have been charged had the
agreed individual discounts been employed. Similarly, individuals who did not purchase HO-A
policies may be entitled to recovery from the Credit Usage Notice Adjustment Fund if Farmers used 
incorrect credit information when calculating their premiums. 


 Current HO-A Policyholders and Former HO-A Policyholders

 Second, Lubin asserts that there is a conflict between those individuals who purchased
HO-A policies before the settlement was proposed and are still insured at the time of settlement and
those individuals who purchased HO-A policies before the settlement was proposed but whose
policies expired and were not renewed before the settlement. Specifically, Lubin contends that those
policyholders who chose not to renew their policies will only be given the retrospective rate
reduction but that those people who are insured on the date of settlement will be given the benefit
of both the prospective and the retrospective rate reductions. 

 When making this argument, Lubin essentially raises two issues: (1) whether the
denial of prospective relief to former HO-A policyholders created a fatal conflict, and (2) whether
the proposed reduction adequately compensates the policyholders. The first assertion is somewhat
similar to Lubin's argument regarding a potential conflict between individuals who obtained an HO-A policy and those who never did. As previously mentioned, this class action originated, in part,
after allegations were made that Farmers was universally charging HO-A premiums that were too
high. To address those concerns, the settlement provided retrospective relief to every individual who
had purchased an HO-A policy before the settlement date. Further, the agreement provided
prospective relief for those individuals currently insured under an HO-A policy and for those who
renew or obtain coverage after the settlement date. In other words, the agreement recognized that
individuals who do not renew their HO-A policies with Farmers will also not be paying future
premiums to Farmers. The fact that the agreement does not provide prospective relief to individuals
who will not be making future premium payments would not seem to create the type of antagonism
that would undermine the legitimacy of a class action. 

 Regarding the issue of whether the reduction is adequate, Lubin points to testimony
elicited at trial stating that full restitution for the overcharges made in the past would require that
policyholders be given a 13.6% reduction. In light of this testimony, Lubin asserts that the 13.6%
recovery was improperly parceled into a 6.8% reduction to be applied to past premiums and a 6.8%
reduction to be applied to future premiums. For this reason, Lubin insists that policyholders who
did not renew their policies will not achieve the full recovery that they were entitled to. Moreover,
Lubin insists that the decision to divide the 13.6% recovery in the manner specified under the
agreement denies all class members their full recovery because complete restitution would require
that policyholders be refunded 13.6% of the premiums paid in the past and that Farmers' future
premium rates also be reduced by 13.6%. (18) 

 Although characterized as arguments against certification, these assertions are more
properly regarded as attacks on the merits of the proposed settlement. For that reason, Lubin's
critique of the terms of the settlement mentioned previously is not ripe for review and is beyond the
scope of this appeal. See McAllen Med. Ctr., Inc., 66 S.W.3d at 234 (concluding that attack on
settlement terms was not ripe for review but noting that district courts may consider terms of
settlement to extent necessary to determine if certification was proper). 


 Policyholders Benefitting Under New Discounts and Policyholders Potentially
Negatively Impacted


 Third, Lubin contends that the adoption and implementation of the individual
discounts discussed above will lead to conflicts among the policyholders. As discussed previously,
the proposed settlement only provides recovery for members of the Discount Class who paid higher
premiums than they would have had the new discounts been used in their premium determinations. 
In light of this, Lubin argues that although some policyholders were required to pay more for their
premiums than they otherwise should have been, other policyholders were charged premiums that
were less than what they would have been charged had the new discounts been in effect. In other
words, Lubin asserts that certain policyholders benefitted from the methods that Farmers used to
calculate its premiums and that those policyholders will be charged more after the settlement occurs. 
Accordingly, Lubin insists there is a conflict between class members who benefitted under the old
system and those class members who benefit from the terms of the settlement. 

 As proof of this assertion, Lubin refers to the proposed notice that will be sent to
Farmers' current and former policyholders as part of the settlement process. The notice states that
"Because some policyholders who do not receive the Individualized Discount Adjustment benefitted
from the way [Farmers] calculated rates under the previous system, they may see a net increase in
their premium under the new adopted discounts at their next policy renewal." (Emphasis added.) 
 As a preliminary matter, we note that the notice simply mentions that the settlement
might result in some policyholders paying more. Potential conflicts serious enough to prohibit
certification of a class action must not be merely speculative. See Employers Cas. Co., 886 S.W.2d
at 476. The unsubstantiated nature of that statement does not weigh in favor of a finding that the
district court abused its discretion by failing to conclude that there was a fatal conflict rendering
certification inappropriate. 

 Even assuming that certain policyholders will be required to pay higher premium rates
if the proposed settlement is approved, that outcome cannot defeat a class action initiated by the
attorney general under his statutory authority to correct an insurer's unlawful conduct. The
foundation of this suit is that Farmers was improperly charging premiums that were too high and that
Farmers' methods for determining individual rates unfairly discriminated against similarly situated
individuals, meaning that some policyholders were paying more than they should have been and
some were paying less. Farmers has agreed to implement the premium reductions and new discounts
in response to allegations that its rating practices did not comply with state law, and none of the
Policyholders objecting to the class settlement have argued that Farmers' former business practices
did not violate the insurance code or have referred to evidence indicating that any of the proposed
class members believe that those practices were consistent with the law. To the contrary, the
Policyholders agree that Farmers violated various insurance code provisions but argue that the
settlement was inadequate in light of Farmers' other violations. 

 For these reasons, Lubin's description of a potential conflict is akin to arguing that
a conflict exists because some individuals benefitted from potentially illegal and discriminatory
conduct to the detriment of the other policyholders and would prefer that the improper conduct
continue. (19) This type of alleged conflict cannot legitimately serve as a basis for preventing the
formation of a class action, particularly one initiated by the attorney general in an attempt to rectify
improper business practices. (20) Although individuals paying less under the old methodology would
no doubt want to avoid paying larger premiums, the desire to pay lower premiums as a result of
alleged statutory violations will not defeat the attorney general's ability to file a class action in order
to compel Farmers to comply with the governing statutory requirements. (21) 

 Moreover, Lubin's arguments would essentially foreclose class-action lawsuits for
most, if not all, discriminatory claims. Discriminatory rate claims will necessarily involve situations
in which some policyholders are allegedly paying more than they should and will likely involve
situations in which some policyholders are paying less than they should. We can find nothing in the
governing statutes that persuades us that those types of discriminatory claims cannot be resolved
through class actions. 

 Finally, we note that the proposed settlement allows any and all class members to opt
out of the class action and pursue their own actions against Farmers if they so choose. Accordingly,
any class members who believe that they might be hurt by any of the terms in the proposed
settlement may opt out of the class. 


 Attorney General and the Class

 Fourth, Lubin contends that there is a conflict between the attorney general and the
class due to the attorney general's representation of the Commissioner and the Department. See Tex.
Const. art. IV, § 22 (explaining attorney general's obligation to represent State); Tex. Gov't Code
Ann. § 402.021 (West 2005) (same). In particular, Lubin asserts that the Commissioner and the
Department have a duty to protect the availability of homeowners' insurance in Texas and, therefore,
had an interest in encouraging Farmers to remain in Texas; however, Lubin insists that this interest
is in conflict with the class's interest in obtaining the maximum monetary benefit from Farmers. 
Moreover, Lubin insists that a class action initiated by class members would not suffer from the
drawbacks of this type of dual representation. For these reasons, Lubin urges that the attorney
general's representation of the Commissioner and the Department creates a conflict between the
attorney general and the class and that this conflict prevents the attorney general from adequately
representing the needs of the class. 

 Given that these types of class actions will always be filed against insurers providing
coverage in Texas, this same potential conflict would, under Lubin's argument, prevent the attorney
general from ever filing a class action. Cf. South Dakota v. United States Dep't of Interior, 317 F.3d
783, 786 (8th Cir. 2003) (noting that merely theoretical conflicts of interest do not render
government inadequate representative in class actions). When addressing this possibility, the
supreme court acknowledged that there might be instances in which the attorney general will have
conflicts "so serious" that he cannot adequately represent a class, but the supreme court also
determined that the attorney general's "public duties to all Texans cannot alone create such a conflict
without again rendering all such class actions impossible." Lubin II, 222 S.W.3d at 426. 

 Moreover, other than simply asserting that this conflict might exist, Lubin does not
substantiate that claim, and the evidence presented during trial contradicts the assertion that a fatal
conflict exists. For example, Lubin's assertion ignores the fact that prior to this class action being
filed, the Department began an administrative proceeding against Farmers and issued an emergency
cease-and-desist order, requiring Farmers to change its rating practices. See Tex. Ins. Code Ann.
§ 83.051 (West 2009) (authorizing Commissioner to issue emergency cease-and-desist order if,
among other things, he believes insurer is committing unfair act that is fraudulent, endangers public
safety, or is causing or will cause imminent public injury). In other words, the Commissioner and
the Department were acting on behalf of Farmers' policyholders in a manner that was contrary to
Farmers' interests and, in fact, in a manner that could have led to Farmers leaving the Texas
insurance market. When addressing the possibility of Farmers leaving, several witnesses testified
during the certification hearing that the Department had planned for the possibility that Farmers
might leave the market and that the Department was willing and prepared to let Farmers leave the
State if Farmers did not adequately compensate the various injured parties. In fact, Karina Casari,
the executive deputy commissioner for the Department, testified that there was a sufficient number
of companies providing insurance in Texas to cover any policyholders affected by Farmers' decision
to leave the Texas market. Casari also testified that the Department was looking into establishing
an "insurer-run facility governed by the State" in the event that Farmers left and that not all of its
former policyholders were able to obtain coverage with a new company. 


 Class Members Favoring Class Action and Class Members Opposed

 Fifth, Lubin notes that because there are no class representatives, there is not a single
class member who supports the certification or the settlement. More importantly, Lubin notes that
those class members who are actively involved in the class action all oppose class certification. For
this reason alone, Lubin urges that there is fatal intra-class antagonism. To support this assertion,
Lubin principally relies on Forsyth, in which this Court determined that intra-class antagonism
existed because a majority of the class members actively participating in the class action opposed
certification. 903 S.W.2d at 151-52. 

 Lubin's argument does not account for the fact that the type of class action at issue
in this case does not require class representatives. Because no class representatives need be or were
selected, it is not possible to perform the type of weighing analysis articulated in Forsyth. Moreover,
given that this class action was initiated to correct Farmers' allegedly unlawful conduct, we do not
believe that the weighing analysis has any applicability here. However, even assuming that a similar
weighing analysis could be performed, given that the class in this case is so much larger than the
class involved in Forsyth, it is not entirely clear that it would be appropriate to allow the objections
raised by only five policyholders to unravel a class action that encompasses hundreds of thousands,
perhaps millions, of policyholders. 

 For the reasons previously given, we cannot conclude that the district court abused
its discretion by failing to find the existence of nonspeculative conflicts that were fatal to the class
certification in this case. 


 Vigorous Prosecution

 In addition to asserting the existence of conflicts strong enough to deny certification,
Lubin contends, in essentially two sets of arguments, that the attorney general could not and did not
vigorously protect the interests of the class. See E & V Slack, Inc., 969 S.W.2d at 568 (explaining
that one of key components to consider in adequacy determination is whether class representatives
will vigorously prosecute class members' claims and defenses). 

 In her first set of arguments, Lubin asserts that the attorney general did not vigorously
prosecute the class members' claims because when negotiating the settlement, the attorney general
abandoned the class members' most valuable claims in return for a simple refund of inflated
premiums. Lubin also contends that even if the attorney general had not abandoned the claims, the
attorney general would not have had standing to make those complaints. 

 For example, Lubin insists that Farmers violated the Fair Credit Reporting Act by
using policyholders' credit reports without informing policyholders when the use of their credit
histories resulted in "adverse action." See 15 U.S.C.A. § 1681m (West 1998 & Supp. 2009)
(imposing disclosure obligations on individuals who use credit information). However, Lubin argues
that the attorney general agreed to abandon those claims under the proposed settlement and would
have been unable to prosecute those claims anyway because those types of claims must be filed by
a "consumer." See id. § 1681n (West 1998 & Supp. 2009) (listing penalties that consumer may
collect for violation of disclosure requirements). Similarly, Lubin insists that Farmers engaged in
discriminatory practices but that the terms of the proposed settlement foreclose the pursuit of various
discrimination claims under the former provisions of the insurance code by the injured policyholders. 
See former Tex. Ins. Code art. 21.21-8, § 2 (prohibiting insurers from engaging in unfairly
discriminatory behavior). Moreover, Lubin asserts that the attorney general could not have pursued
the discriminatory claims even if he wanted to because those claims must be initiated by "a person
who has sustained economic damages" as a result of discriminatory practices. See id. art. 21.21-8,
§ 3 (emphasis added). Finally, Lubin contends that the proposed settlement precludes class members
from suing Farmers on the ground that Farmers charged excessive management fees and argues that
the attorney general could not have pursued that claim anyway because the claim must be pursued
by individuals to whom an insurer owes a fiduciary duty. (22) See Schlumberger Tech. Corp.
v. Swanson, 959 S.W.2d 171, 176-77 (Tex. 1997) (explaining circumstances in which fiduciary
duties may arise).

 It is not disputed that the proposed settlement agreement releases the claims
mentioned above and others as well. See Daccach, 217 S.W.3d at 450 (holding that "claims not
pursued, or abandoned, in a class suit seeking damages that proceeds to final judgment on other
claims arising from the same subject matter are subject to preclusion"). However, Lubin's
arguments regarding the decision to release these claims are more properly viewed as attacks on the
adequacy of the proposed settlement rather than attacks on the attorney general's ability to
adequately represent the class. (23) See Lubin II, 222 S.W.3d at 426 n.55. For reasons discussed
previously, any attack on the fairness or adequacy of the proposed settlement is premature and
outside the scope of this appeal. See McAllen Med. Ctr., Inc., 66 S.W.3d at 234. (24) 

 In her second set of arguments, Lubin argues that when the attorney general decided
to settle the various claims, he did not fairly evaluate the value of the claims that were abandoned. 
As proof of this assertion, Lubin points to the testimony of Jeffery Boyd, who worked for the
attorney general's office and was involved in the negotiations with Farmers. In his testimony, Boyd
stated that he did not know if anyone had calculated the value of certain claims before agreeing to
the settlement. Specifically, he testified as follows:


If you want to sit down and say, what's this claim worth and start estimating anything
beyond that, you know, I don't know that we sat down to calculate. 


. . . 


[W]hat's the very most we could get if we asserted this individual claim? I don't
know that anyone did that. 



 Further, Lubin insists that the attorney general refused to negotiate a settlement that
did not release the claims Lubin wanted to pursue and abdicated his duty to vigorously represent the
class members' interests by choosing to allow the courts, rather than himself, to decide whether the
proposed settlement was fair. (25) As support for the argument that the attorney general refused to
consider a settlement that did not release the claims discussed above, Lubin refers to additional
testimony from Boyd in which he communicated that the attorney general believed that recovery
under the statutory provisions described above would have been windfalls to the policyholders and
would have inappropriately punished Farmers to an excessive degree. (26) 

 As with Lubin's previous set of arguments, the claims regarding the release of certain
claims essentially attack the fairness of the terms of the settlement rather than the ability of the
attorney general to effectively pursue the class action. (27) Moreover, although Boyd testified that he
was unaware of any specific calculations occurring, his testimony was referring to the claims of the
Credit Usage Notice Class. As discussed earlier, although the exact value of the recovery for those
claims was not determined at the time of certification, the proposed settlement guarantees that the
class members will recover 100% of any overpayments that they made as the result of inaccurate
credit information. (28) Furthermore, Boyd testified that the attorney general worked with the
Department to develop reasonable estimates for the value of the claims at issue in this case. (29) 

 Regarding the district court's role in the fairness of the settlement, Boyd did
repeatedly assert the proposition that the court should review the fairness of the proposed settlement
and that it should not approve the settlement if it believed that the terms were unfair. However, he
also testified that both he and the attorney general believed that the settlement was fair and would
not have filed the proposed settlement otherwise. 

 In addition to this testimony, the terms of the proposed settlement and the evidence
presented regarding the negotiations between Farmers and the attorney general and the Department
support the district court's determination that the attorney general's representation satisfied the
adequacy element and that the attorney general was actively pursuing the class members' interests. 
Regarding the negotiations, deputy commissioner Casari testified that the attorney general and the
Department rejected Farmers' initial settlement proposal, which only addressed a small percentage
of the problems identified by the attorney general and which provided no restitution for
overpayments made by policyholders. (30) Further, Casari explained that the Department always
insisted that Farmers would have to provide some form of restitution and that the Department's
primary concern was protecting the policyholders. Similarly, Boyd testified that Farmers was
originally adamant about not paying any type of restitution to its current and former policyholders
but that the attorney general, on several occasions, threatened to leave the negotiations if Farmers
did not agree to provide some form of relief for past overpayments. In addition, he testified that the
attorney general insisted that he would not settle for anything less than a complete recovery for
members of the Discount Class and Credit Usage Notice Class. Further, Boyd communicated that
during the negotiations, the attorney general insisted that any settlement must require Farmers to
change its credit notices and include language that more clearly indicates when a policyholder's
premiums have been increased due to his or her credit information. Lastly, Boyd communicated that
the attorney general fought to include a provision within the settlement allowing the attorney general
to back out of the settlement if a sufficient number of the class members express their dissatisfaction
with the proposed agreement by choosing to opt out of the settlement. 

 As described earlier, under the proposed settlement, Farmers ultimately agreed to
these demands. First, Farmers agreed to provide retrospective and prospective rate relief and
complete recovery for the Discount Class and the Credit Usage Notice Class. In fact, under the terms
of the settlement, Farmers agreed to fund one of the largest insurance settlements in this State's
history. (31) Second, Farmers agreed to adopt a new credit notice that will inform policyholders when
their credit histories result in adverse action regarding their policies and also agreed to estimate the
financial impact of the adverse actions. Third, as mentioned previously, the proposed settlement
allows the attorney general as well as Farmers to abandon the settlement if the class members are
dissatisfied with the settlement and also allows each class member to opt out of the class action if
he or she so desires. (32) 

 Additionally, although it does not directly bear upon the claims advanced by the
Policyholders, we note that as part of his investigation, the attorney general had alleged that Farmers
was inappropriately tying its homeowners and automobile insurance policies together, meaning that
it would not issue either type of policy unless the potential policyholder agreed to buy both types of
insurance from Farmers. As part of the proposed settlement, Farmers agreed to not require
"individuals desiring to purchase homeowners insurance from [Farmers] also purchase automobile
insurance from [Farmers], or vice versa, and not to refuse to deal in good faith with any homeowners
insurance customer who purchases automobile insurance from another carrier, or vice versa." 

 Moreover, when determining whether the typicality and adequacy requirements are
met, courts should consider "the zeal and competence of class counsel," see E & V Slack, Inc., 969
S.W.2d at 569, and in light of that proposition, we note that Lubin's challenges to the adequacy
determination ignore the unique position that the attorney general serves in the State. The attorney
general's role as representative for the State gives him unparalleled experience regarding insurance
law in Texas. Cf. In re Antibiotics Antitrust Actions, 333 F. Supp. 278, 280-81 (S.D.N.Y. 1971)
(explaining that attorney generals are able to provide class with experienced counsel and have
sufficient resources to maintain action). Moreover, the attorney general's status as a publicly elected
official answerable to the people of Texas and to the hundreds of thousands of policyholders who
are members of this class action would seem to provide additional assurance that the attorney general
is acting with the requisite amount of zeal. Cf. Leonard, 125 S.W.3d at 67 (stating that court may
consider class representative's desire to protect class members when determining if class-action
requirements have been met). 

 In addition to not addressing the attorney general's position in the State, Lubin's
arguments ignore the unique advantages that the attorney general has over a private litigant
attempting to pursue a similar class action, including the investigative powers he employed while
examining Farmers' business practices. Because citizens routinely file complaints against insurers
with the attorney general's office, the attorney general had access to information pertaining to
Farmers' business practices prior to filing suit. Additionally, prior to filing suit, the attorney general
served Farmers with various civil investigative demands. See Tex. Bus. & Com. Code Ann. § 17.61. 
Consequently, he is uniquely familiar with the subject matter forming the foundation of this suit. 
See Leonard, 125 S.W.3d at 67 (explaining that familiarity with subject matter of suit is relevant
consideration when determining if class-action requirements have been satisfied); Forsyth, 903
S.W.2d at 150 (same). 

 Finally, because the attorney general initiated this proceeding on behalf of and in
conjunction with the Department, the attorney general's bargaining position was enhanced by the
Department's ability to impose significant penalties on insurers for insurance code violations. See
Tex. Ins. Code Ann. § 84.021 (West 2009) (authorizing imposition of various administrative
penalties). It seems logical to assume that the threat and coercive effect of these additional
enforcement provisions, which would not be available in private class actions, weighed heavily in
Farmers' decision to agree to the proposed settlement. 

 That supposition is confirmed by the testimony of Stephen Leaman, the vice president
for Farmers. As discussed previously, prior to the certification of this class action, the
Commissioner issued a cease-and-desist order, compelling Farmers to discontinue some of its
allegedly improper conduct. When explaining why Farmers agreed to enter the settlement
agreement, Leaman testified that the cease-and-desist order forced Farmers to chose between leaving
the Texas market or succumbing to the pressure and settling the claims made by the attorney general. 
In light of the effect of the cease-and-desist order, Leaman stated that a private litigant, even in a
class-action format, would not have been able to apply the same level of pressure as the attorney
general did during the negotiations. (33) 

 For all the reasons previously expressed, we cannot conclude that the district court
abused its discretion by concluding that the adequacy and typicality requirements were met. See
Leonard, 125 S.W.3d at 66 (explaining that trial courts do not abuse their discretion by concluding
that adequacy requirement was met if there is evidence to support determination). (34) 


Predominance and Superiority

 Lubin also challenges the district court's conclusion that the common questions of
law and fact predominate over individual questions. See Lapray, 135 S.W.3d at 663 (stating that
predominance is one of more stringent prerequisites for certification). In arguing that the
predominance requirement is not met, Lubin asserts that because the class action is based on claims
of misrepresentation and failures to disclose information, the attorney general will be required to
prove individual reliance for each class member. See Stromboe, 102 S.W.3d at 693 (explaining that
reliance is element of misrepresentation claim); Swanson, 959 S.W.2d at 181 (stating that reliance
is element of fraud by non-disclosure claim). Because individual reliance is an element that will
have to be proven, Lubin insists that the class-action certification was improper. Cf. Stromboe,
102 S.W.3d at 693-94 (concluding that class certification was improper, in part, because record did
not support finding of class-wide reliance due to fact that some class members did not rely
on statement). (35) 

 As a preliminary matter, we note that it is not entirely clear that individual reliance
is actually an element of the claims made by the State because the claims do not seem to pertain to
any representation made by Farmers or to any conduct that the policyholders engaged in. As
mentioned previously, the claims are based on allegations that Farmers overcharged its former and
current policyholders through the manner in which it determined premium rates and that these
overcharges were done on a uniform and systematic basis. Specifically, the attorney general alleged
that Farmers charged all of its former and current HO-A policyholders excessive premiums for the
coverage provided by the HO-A policies. Moreover, the attorney general alleged that Farmers
unfairly used its policyholders' credit scores and the ages of their homes when determining premium
rates, which led to individuals with similar risk profiles being charged different premiums. Also,
the attorney general contended that Farmers failed to consider the geographic location of its
policyholders' homes when determining their HO-A premiums. Finally, the attorney general alleged
that Farmers improperly failed to inform its policyholders when their credit histories resulted in
higher premiums, which denied policyholders of the opportunity to verify the accuracy of the credit
information Farmers was using and led to Farmers charging some of its policyholders premiums that
were too high due to erroneous credit information. In making these claims, the State did not
specifically allege that Farmers made any specific misrepresentations to its policyholders or that the
policyholders relied on those misrepresentations. 

 Moreover, although subsection 16(a) of former article 21.21 of the insurance code
did list "reliance" as an element that must be proven in cases in which it is alleged that an insurer
engaged in "unfair or deceptive acts or practices," that requirement was limited to suits involving
a "deceptive act or practice enumerated in" subsection 17.46(b) of the Deceptive Trade Practices
Act. Former Tex. Ins. Code art. 21.21, § 16(a). None of the deceptive practices or acts listed in that
portion of the Deceptive Trade Practices Act are at issue in this case. See Tex. Bus. & Com. Code
Ann. § 17.46(b) (West Supp. 2008). 

 Even assuming that individual reliance is an element of the claims asserted, we would
still be unable to conclude that the district court abused its discretion by determining that the
predominance element had been met. In light of the State's allegations discussed above, any
individual reliance issues would not predominate over the common issues. E & V Slack, Inc.,
969 S.W.2d at 569 (acknowledging that predominance requirement is met if focus of efforts of
litigants and court will be on common issues and stating that it is not necessary for common issues
to outnumber individual ones). The predominate issue inherent in these claims is whether Farmers
overcharged its policyholders, not whether Farmers made individual misrepresentations. See
Chastain, 26 S.W.3d at 34 (explaining that in class-action suit alleging that storage company charged
its customers for insurance but did not obtain policy, predominate issue was whether customers were
improperly charged fee, not whether company made individual misrepresentations). Furthermore,
to the extent that proof of reliance would be required in this type of case involving allegations of
"uniform" misconduct by Farmers in the premiums it charges, payment by the policyholders, on its
own, would constitute proof of reliance. See Alford Chevrolet-Geo v. Jones, 91 S.W.3d 396, 405-06
(Tex. App.--Texarkana 2002, pet. denied) (stating that allegation that customers paid taxes that they
did not owe after being billed for them was allegation of reliance); see also Stromboe, 102 S.W.3d
at 693-94 (explaining that there may be circumstances in which reliance may be proven by class-wide evidence). 

 Moreover, were we to adopt Lubin's assertion that the predominance element cannot
be satisfied in this case because of the need for proof of individual reliance, that would effectively
prohibit the attorney general from pursuing any class actions in which a claim is made that insurers
charged their policyholders premium rates that were too high even though the legislature directly
empowered the attorney general to file class actions on behalf of policyholders that have been injured
by an insurer's actions. See former Tex. Ins. Code art. 21.21, § 17; see also id. § 4 (listing various
unlawful methods, acts, or practices). 

 Regardless of whether reliance is an element of the claims pursued, Lubin's assertions
ignore the fact that this case involves a settlement class action. While it is true that members of non-settlement class actions are held to the same level of proof that would be required for individual
suits, see Stromboe, 102 S.W.3d at 693-94, a settlement class action by its nature cannot require the
same level of proof. The proposed settlement contemplates giving awards without any need for class
members to offer any evidence of reliance. Accordingly, if the settlement is approved, proof of
individual reliance for the claims made by the attorney general will not be required, and there will
be no trial. Cf. Capital One Bank v. Rollins, 106 S.W.3d 286, 294 (Tex. App.--Houston [1st Dist.]
2003, no pet.) (explaining that predominance requirement is not met if "the sheer complexity and
diversity of the individual issues" would overwhelm or confuse trier of fact). 

 Although proof of individual reliance may not be required, we acknowledge that
individual considerations will have to be addressed when determining each class member's
individual recovery. For example, the attorney general alleged that Farmers was charging HO-A
premiums that were too high for the type of coverage provided, and the proposed settlement calls
for a flat-rate reduction to the premium Farmers charged and will charge its policyholders for future
HO-A policies. Because the amount of the individual premiums Farmers charged varied, the
retrospective recovery for each individual in the Rate Class will depend on the premiums actually
paid. As with the Rate Class, the retrospective recovery for the Discount Class will depend on
individual information because the recovery is designed to compensate policyholders who were
charged rates that were higher than they would have been had Farmers properly accounted for the
age and location of their homes and their credit histories. However, under the proposed settlement,
the individual information for both types of awards will be obtained from Farmers' records showing
the premium amounts paid and the discounts, if any, that should have been given to its
policyholders. (36) See Entex v. City of Pearland, 990 S.W.2d 904, 917 (Tex. App.--Houston
[14th Dist.] 1999, no pet.) (explaining that need for individual determinations regarding damages
for class members does not prevent certification of class). 

 Unlike for members of the Rate Class and Discount Class, individuals in the Credit
Usage Notice Class seeking recovery will have to submit some information to Farmers. As
described earlier, this recovery is designed to compensate individuals who were inappropriately
charged higher rates because of mistakes in their credit reports. To obtain recovery, policyholders
will have to submit current and correct credit reports in order to ascertain whether Farmers charged
rates based on incorrect information. But, as with the other subclasses, the amount of the awards
will be determined from Farmers' records without the need for any additional information from the
policyholders. 

 Regarding superiority, we note that Lubin does not directly challenge that component
of the predominance element. In order for this element to be met, a court must determine that a class
action is superior to other methods for fairly adjudicating the controversy. E & V Slack, Inc., 969
S.W.2d at 571. When determining whether this component is met, courts may consider the interest
that class members may have in "individually controlling the prosecution or defense of separate
actions," "the extent and nature of any litigation concerning the controversy already commenced by
or against members of the class," the desirability of pursuing the suit in the particular forum, and
"the difficulties likely to be encountered in the management of a class action." See Leonard,
125 S.W.3d at 70; see also former Tex. Ins. Code art. 21.21, § 18(b)(3) (listing factors for court to
consider when determining if predominance and superiority are met). In addition to the factors
previously listed, courts have also considered the potential size of the individual awards, the
feasibility of traditional litigation, and the time and effort the trial court invested in familiarizing
itself with the issues in the class action. See Leonard, 125 S.W.3d at 70; Remington Arms Co., Inc.
v. Luna, 966 S.W.2d 641, 643 (Tex. App.--San Antonio 1998, pet. denied). 

 Nothing in the record compels a determination that pursuing the class action in Travis
County is less desirable than other potential venues, particularly in light of the fact that several of
the Policyholders had attempted to file class actions raising similar issues in Travis County. 
Moreover, given that this is a settlement class action, there are no potential litigation class-management issues or potential litigation expenses that would undermine a superiority finding. 
Compare E & V Slack, Inc., 969 S.W.2d at 571 (stating that litigation-expense and class-management issues are relevant to superiority determination), and Leonard, 125 S.W.3d at 70
(highlighting that courts should consider difficulties in managing class action), with Amchem
Products, Inc. v. Windsor, 521 U.S. 591, 620 (1997) (explaining that courts do not need to consider
"whether the case, if tried, would present intractable management problems" in settlement class
actions because "the proposal is that there be no trial"). 

 Although the amount of money at issue in this case is estimated to be quite large, the
number of policyholders involved indicates that the amount of recovery that individual policyholders
might actually obtain will be relatively small. See Leonard, 125 S.W.3d at 70 (noting that "marginal
case value for individual cases" can be important consideration in determining whether superiority
requirement is met). Indeed, during the certification hearing, the Commissioner testified that the
maximum recovery any class member would likely obtain as a result of the adoption of the new
discounts is $600. The modest potential individual recovery weighs in favor of class certification
because class actions are designed to provide efficient means for claimants with common issues to
obtain a remedy when it would not be economically feasible to obtain recovery through multiple
individual suits. Bloyed, 916 S.W.2d at 952. Furthermore, given that individual recovery will
largely depend on an examination of Farmers' records and will not require the introduction of
individualized evidence, the interests of judicial economy also weigh in favor of a finding of
superiority. See E & V Slack, Inc., 969 S.W.2d at 571 (noting that mini-trials to determine individual
recovery undermine economy-of-scale justification for class action). Finally, we note that as part
of this certification proceeding, the trial court held extensive hearings and reviewed numerous
documents outlining the foundation for this lawsuit. Accordingly, the court invested significant time
and effort in familiarizing itself with the issues presented in this case. 

 It is true that the Policyholders have filed or are members of other lawsuits regarding
the conduct forming the basis for this class action. However, given the facts that the other lawsuits
were also class actions and that the Policyholders want those class actions to proceed, we cannot
conclude that the district court abused its discretion by failing to find that the Policyholders had an
interest in individually controlling direction of their own cases that was sufficient to overwhelm the
other factors weighing in favor of a superiority determination in this case. 

 For all of these reasons, we cannot conclude that the district court abused its
discretion by concluding that the predominance requirement was satisfied. 

 Having found no abuse of discretion in the district court's determination that the
prerequisites to class certification had been met, we overrule Lubin's first issue on appeal. 


Scope of Former Article 21.21

 On appeal, Lubin also asserts that the district court abused its discretion by certifying
this class action because the allegations forming the basis for this suit exceed the scope of the former
insurance code provisions governing this case. As support for this argument, Lubin refers to the
attorney general's second amended petition. (37) The petition contains nine paragraphs under the
section titled "Causes of Action." Each of the nine paragraphs lists conduct engaged in by Farmers
that allegedly violated various former insurance code provisions and the deceptive trade practices
act. Specifically, in his petition, the attorney general alleged the following misconduct:

 


 Farmers used credit histories, home ages, and home locations for the purpose
of determining premiums in a discriminatory and inconsistent manner 

 Farmers improperly used various factors and information in a manner that led
to increased premium rates (38) 


 


 Farmers did not inform its policyholders when their credit histories resulted
in increased premiums


 


 Farmers improperly collected management fees, which resulted in increased
premium rates

 Farmers improperly switched policyholders from one insurance company to
another, which resulted in increased premiums 



 The attorney general repeated many of these allegations in the portion of his petition
detailing "common questions in this case" and also listed an allegation that Farmers may have
violated "state antitrust laws." As mentioned previously, the attorney general alleged that Farmers
was improperly tying the sale of its homeowners insurance policies with its automobile insurance
policies and that Farmers' discontinuance of its HO-B policies essentially constituted an unlawful
boycott of those types of policies. 

 The petition alleged that the conduct listed above violated former article 21.21,
section 3, which prohibited insurers from engaging in an "unfair method of competition or an unfair
or deceptive act or practice in the business of insurance." Former Tex. Ins. Code art. 21.21, § 3; see
also id. § 4 (listing prohibited acts or practices). Furthermore, the petition contended that some of
the conduct listed violated former article 21.21-6, which prohibited insurers from charging an
individual a different rate or refusing to insure an individual because of specific demographic
information, including the individual's race, gender, religion, or geographic location. Id. art. 21.21-6, § 3. Also, the petition stated that some of the listed conduct violated former article 21.21-8, which
prohibited insurers from unfairly discriminating "between individuals of the same class and of
essentially the same hazard." Id. art. 21.21-8, § 2. 

 In light of the preceding, Lubin contends that this class action exceeds the scope of
the governing statutes because the attorney general is not authorized to file class actions based on
conduct that violated former articles 21.21, section 3; 21.21-6; or 21.21-8. In particular, Lubin notes
that former section 17 only allowed a class action when "a member of the insurance buying public
has been damaged by an unlawful method, act, or practice defined in Section 4 of this Article as an
unlawful deceptive trade practice." Id. art. 21.21, § 17(a) (emphasis added). In light of this
language, Lubin asserts that the attorney general may only maintain a class action based on conduct
listed in former section 4 but insists that the type of conduct forming the basis for this suit does not
fall within any of the eleven types of prohibited behaviors described in former section 4. See id. § 4
(listing eleven groups of "unfair methods of competition and unfair and deceptive acts or practices
in the business of insurance"). For that reason, Lubin contends that the proposed settlement
improperly attempts to settle claims that the attorney general had no authority to bring. 

 Even assuming that the attorney general may not file class actions based on violations
of former articles 21.21-6 and 21.21-8 and former article 21.21, section 3, the attorney general's
petition also alleged that all of the conduct described above violated former section 4 as well. In
particular, the attorney general contended that Farmers' failure to disclose to its policyholders the
conduct listed in the "Causes of Action" section described above generally violated former section
4. In addition, the attorney general stated that the failure to disclose the conduct specifically violated
former subsection 4(11), which defines "Misrepresentation of Insurance Policy" as an "unfair and
deceptive" act or practice and prohibits insurers from misrepresenting policies by:


(b) failing to state a material fact that is necessary to make other statements made not
misleading, considering the circumstances under which the statements were made;
[or]


. . .


(e) failing to disclose any matter required by law to be disclosed, including a failure
to make disclosure in accordance with another provision of this code. 



Former Tex. Ins. Code art. 21.21, § 4(11); see also Tex. Bus. & Com. Code Ann. § 17.46(b)(24)
(stating that "deceptive acts or practices" includes "failing to disclose information concerning goods
or services which was known at the time of the transaction if such failure to disclose such
information was intended to induce the consumer into a transaction into which the consumer would
not have entered had the information been disclosed"). Moreover, the allegation regarding antitrust
laws found in the "common questions" portion of the petition also stated that Farmers' conduct
violated former section 4(4), which prohibited an insurer from committing "any act of boycott,
coercion[,] or intimidation resulting in or tending to result in unreasonable restraint of, or monopoly
in, the business of insurance." Id. § 4(4). (39) In light of the language of the governing statutes and the
fact that the attorney general specifically alleged that Farmers' conduct violated former section 4,
we cannot conclude that the district court acted arbitrarily or unreasonably when certifying the class. 
The fact that the alleged conduct might have been violative of provisions in addition to former
section 4 would not seem to foreclose the ability of the attorney general to pursue those claims in a
class-action form. 

 In addition, we note that the specific claims that Lubin contends should not have been
released under the settlement agreement (claims for Fair Credit Reporting Act violations;
discrimination under former article 21.21, section 8; and excessive management fees) all originate
from the same course of conduct and transactions that formed the basis of the attorney general's
allegations against Farmers and that he asserted violated former section 4. For that reason, Lubin
has not asked us to determine whether the attorney general may release claims that have no
relationship to claims that the attorney general may pursue through a class action or that he listed as
a basis for the suit. (40) The proposed settlement contemplates a universal settlement of claims
originating from Farmers' conduct previously described, and the fairness and adequacy of that
settlement will be addressed in a subsequent hearing. See McAllen Med. Ctr., Inc., 66 S.W.3d
at 234. 

 Finally, although we need not decide the issue here, we note that even if, as alleged
by Lubin, the governing statutes did not authorize the attorney general to pursue a class action on
all of the claims specified, we would still be unable to find an abuse of discretion here. The Supreme
Court has indicated that class-action settlements may release claims that could not have been pursued
had the case been tried, as long as the court had jurisdiction over some of the claims presented. For
example, in Matsushita Elec. Indus. Co. v. Epstein, the Supreme Court determined that a class-action
settlement in state court that released state claims as well as "claims solely within the jurisdiction
of the federal courts" prohibited class members from pursuing the federal claims in federal court. 
516 U.S. 367, 375, 387 (1996). In other words, even though the federal claims could not have been
pursued in state court, the release of those claims through the class-action settlement still prevented
parties from pursuing those claims in federal court. Accordingly, the settlement released claims that
could not have been otherwise pursued. 

 For all these reasons, we cannot conclude that the district court abused its discretion
in certifying this class action, and therefore, we overrule Lubin's second issue on appeal. 


DISCUSSION: THE HOOKSES' CLAIMS As mentioned previously, there were two groups of policyholders that intervened in
this case. In this section, we will address the arguments against certification made by the second
group: the Hookses. However, before addressing those claims, it is helpful to provide some
background information regarding another class action filed in response to Farmers' conduct. 

 As detailed earlier, the attorney general originally sued Farmers in August 2002. 
Later that same month, Geter filed a class action on behalf of all of Farmers' policyholders who were
told that their HO-B policies would not be renewed. The Hookses are members of the Geter class
action. In that case, Geter essentially contended that Farmers did not have the authority to
discontinue all of its HO-B policies because, with a few exceptions, the terms of those policies
provided the policyholders with the right to renew their policies if they chose to. See Farmers Group
Inc. v. Geter, Nos. 09-03-00404-CV, 09-03-00396-CV, 2004 Tex. App. LEXIS 9364, at *26
(Tex. App.--Beaumont Oct. 21, 2004, no pet.) (mem. op.). 

 In December 2002, the attorney general amended his petition in this case in order to
add a class-action component and also filed a proposed class settlement. The proposed settlement
defined three subclasses, including the Rate Class. The Rate Class was composed of all of Farmers'
policyholders who had been informed that their HO-B policies would not be renewed. For that
reason, as mentioned earlier, the Rate Class and the proposed class in the Geter lawsuit were
composed of the same policyholders, including the Hookses. Moreover, the proposed settlement in
this case released all claims related to Farmers' decision to no longer offer HO-B policies, meaning
that the nonrenewal claims asserted in the Geter class action will likely be extinguished if the
settlement is ultimately adopted. (41) 

 On appeal, the Hookses assert that the district court improperly approved the class
definitions contained within the proposed settlement. Furthermore, the Hookses contend that the
proposed notice filed as part of the settlement "does not adequately advise class members of the
terms and conditions of the class settlement." In addition, the Hookses assert that the attorney
general did not have the authority to release the nonrenewal claims made by the Geter class or "to
request certification of a settlement class to implement the release of the nonrenewal claims." 
Finally, in their supplemental brief, the Hookses argue that the district court inadequately analyzed
the impact that the proposed settlement would have on the class action filed by Geter. We will
address those issues in the order listed. 


Class Definitions

 In their first issue on appeal, the Hookses assert that the Rate Class definition is too
broad. See McAllen Med. Ctr., Inc., 66 S.W.3d at 232 (explaining that courts have obligation to
protect absent class members from overly broad class definitions). As proof of this assertion, the
Hookses state that the purpose of the Rate Class is to compensate individuals who paid HO-A
premiums that were too high but that the Rate Class definition also includes individuals who did not
purchase HO-A policies from Farmers after being informed that their HO-B policies would not be
renewed. (42) Moreover, the Hookses essentially challenge the proposed settlement by asserting that
the settlement improperly requires members of the settlement gap described above to release all
claims that they may have regarding the decision to no longer provide HO-B policies even though
those individuals will receive no compensation for their release. Similarly, the Hookses state that
the Discount Class and Credit Usage Notice Class likely include individuals who will receive no
compensation under the terms of the settlement but will still be asked to release all of their HO-B
related claims. (43) 

 Previously in this opinion, we determined that Lubin's arguments regarding the
release of certain claims were beyond the scope of this appeal. For those same reasons, we believe
that the Hookses' arguments regarding the equitability of the release of the HO-B nonrenewal claims
are not properly before us and should be reserved for the fairness hearing. (44) See id. at 234. 
Regarding the alleged settlement gap, it is not entirely clear that the presence of an alleged settlement
gap has any direct bearing on the issues to be decided during the preliminary certification hearing:
whether the requirements for certification have been met. In fact, in their briefs, the Hookses
acknowledge that alleged settlement gaps are typically addressed during fairness hearings. See
Johnson v. Scott, 113 S.W.3d 366, 376-77 (Tex. App.--Beaumont 2003, pet. dism'd) (analyzing
impact of potential settlement gap during fairness component of settlement class action). Finally,
given the limited information in the record regarding the presence of the alleged settlement gap, we
are not persuaded that a determination regarding the presence of a settlement gap in this case should
be made at this preliminary juncture. 

 For these reasons, we overrule the Hookses' first issue on appeal. 


Notice 

 In their second issue on appeal, the Hookses assert that the notice submitted as part
of the proposed settlement does not adequately explain the terms and conditions of the settlement. (45) 
See Northrup v. Southwestern Bell Tel. Co., 72 S.W.3d 1, 8 (Tex. App.--Corpus Christi 2001, pet.
denied) (op. on reh'g) (explaining that in settlement class actions, "adequate notice must be provided
to the class members of all of the material terms of the proposed settlement"). (46) Specifically, the
Hookses contend that the notice is insufficient because it does not specify the actual amount of
money that the Rate Class will recover and because it does not explicitly state that "many class
members will receive no payment of any kind." (47) 

 Although the Hookses contend that the missing information described above renders
the notice ineffective, the Hookses have referred to no cases requiring either type of disclosure, and
we have found none. Moreover, class notices do not have to chronicle every detail in order to be
effective, and class members "are not expected to rely upon the notices as a complete source of
settlement information." Grunin v. International House of Pancakes, 513 F.2d 114, 122 (8th Cir.
1975); see Hall v. Pedernales Elec. Coop., Inc., 278 S.W.3d 536, 543-44 (Tex. App.--Austin 2009,
no pet.) (explaining that notice is generally effective when it prompts class members to investigate
foundation of action and instructs class members regarding how they may obtain all of information
regarding settlement). 

 The requirements for effective notices issued as part of a class action pursued under
the insurance code are listed under former article 21.21, section 18. Former Tex. Ins. Code
art. 21.21, § 18(e); see also Tex. R. Civ. P. 42(c)(2)(B) (listing similar requirements for notice issued
in case in which court determined that predominance element was satisfied). Specifically, former
section 18 required that "members of the class" be given "the best notice practicable under the
circumstances, including individual notice to all members who can be identified through reasonable
effort." Former Tex. Ins. Code art. 21.21, § 18(e). In addition, it listed three pieces of information
that must be included in the notice:


(1) the court will exclude the member notified from the class if he so requests by a
specified date;


(2) the judgment, whether favorable or not, will include all members who do not
request exclusion; and


(3) any member who does not request exclusion, if he desires, may enter an
appearance through counsel.



Id. § 18(f). The rules of civil procedure provide additional guidance and list the above requirements
and state that a notice must contain a description of "the nature of the action," "the definition of the
class certified," and "the class claims, issues, or defenses." Tex. R. Civ. P. 42(c)(2). For
settlements, the rules also state that the class-action notice must state "the material terms of the
proposed settlement." Id. R. 42(e)(1)(B). 

 Under the terms of the proposed settlement, notice will be sent by direct mail to the
class members' most recent addresses. (48) See Grunin, 513 F.2d at122 (explaining that delivering
notice to last-known address can be most practical way to provide notice to class members). The
notice provides instructions for class members regarding what steps they need to take in order to opt
out of the settlement, including the date by which their election must be received, and warns
recipients that they will be bound by the settlement if they do not opt out. See Northrup v.
Southwestern Bell Tel. Co., 72 S.W.3d 16, 20 (Tex. App.--Corpus Christi 2002, pet. denied) (noting
that effective notice advised class members of opt-out information and deadline and explained that
judgment would be binding). Further, the notice provides information regarding how policyholders
who do not opt out of the settlement may still object to the terms of the settlement, and the notice
states that objecting class members "may appear, in person or through counsel, to object and be
heard . . . at the Settlement Hearing." See Mangone v. First USA Bank, 206 F.R.D. 222, 232 (S.D.
Ill. 2001) (noting that effective notice explained how to opt out or object to terms of settlement); see
also Hall, 278 S.W.3d at 543 (stating that to satisfy due process, notice must apprise class members
of pendency of action and explain how to present objections). The notice also informs the class
members that they have the option of seeking "the advice and guidance" of their own attorney if they
so desire. See Northrup, 72 S.W.3d at 20 (noting that effective notice stated that members may
"enter an appearance through counsel"). 

 Further, the notice in this case provides a summary of the allegations that the attorney
general made against Farmers and also provides details regarding the parties involved in the dispute.
See id. at 20 (explaining that effective notice advised members of nature of suit). Also, the notice
lists and defines the various subclasses and instructs the recipients that they may be entitled to
recovery under one or more of the subclasses. 

 In addition, the notice also provides information regarding the settlement. See 
Mangone, 206 F.R.D. at 232 (noting that effective notice in settlement class action, among other
things, described terms of settlement). Regarding compensation, the notice lists the retrospective
and prospective premium-rate reductions. Although no specific recovery values for the Discount
Class and Credit Usage Notice Class are given, the notice states that recovery for those subclasses
will be determined after the notice is sent out and reveals that the Department will be verifying the
recovery before it is sent out. Additionally, the notice specifies that individuals do not have to
engage in any action in order to obtain relief as members of the Rate Class and Discount Class
provided that the individuals qualify for those subclasses, and the notice informs the recipients how
to determine whether they qualify for relief as members of the Credit Usage Notice Class. Moreover,
the notice lists the amount of compensation that the State will receive ($2 million) under the
proposed settlement and details the manner in which the class members will receive their
compensation. See id. (concluding that notice in settlement class action was adequate in part because
it provided information regarding fees and explained how funds will be distributed). Further, the
notice lists the parties and claims that will be released under the settlement, including the release of
all claims relating to the decision to no longer offer HO-B policies. See Daccach, 217 S.W.3d at 458
(explaining that effective notice should inform class members of preclusive effect that class action
may have on individual claims). 

 Importantly, the notice states when and where the settlement hearing will be held, lists
contact information in case any of the recipients have questions regarding the notice, and provides
instructions for obtaining copies of the proposed settlement and for viewing the complete settlement
on the Department's website. See Hall, 278 S.W.3d at 544 (noting, when determining that notice
in settlement class action was adequate, that notice provided contact information and listed website
where settlement terms could be viewed); see also Mangone, 206 F.R.D. at 232-33 (explaining that
effective notice indicated time and place of settlement hearing and listed contact information for
class members to make inquiries about settlement). 

 For all these reasons, we cannot conclude that the district court abused its discretion
by approving the proposed notice, and therefore, we overrule the Hookses' second issue on appeal. 


Authority of Attorney General

 In their third issue, the Hookses assert that former section 17 of article 21.21 does not
authorize the attorney general to release the claims pursued in the Geter class action as part of a
settlement. Specifically, the Hookses contend that former section 17 only allows the attorney general
to pursue class actions based on unlawful methods, acts, or practices defined in former section 4. 
See former Tex. Ins. Code art. 21.21, §§ 4, 17. In light of the fact that the failure to renew policies
is not listed as a prohibited act in former section 4, the Hookses contend that the release of the
nonrenewal claims as part of the proposed settlement was improper because the attorney general may
not pursue that claim (49) and because the claims forming the basis for this class action (excessive
premium rates and discriminatory practices) are legally distinct from the contract claims pursued by
the Geter class. 

 Lubin raised similar concerns in her briefs, although her assertions focused on the
claims forming the basis for the class action rather than a claim that was released but not specifically
pursued or pleaded as part of the class action. When addressing Lubin's assertions, we noted that
the claims that she argued should not have been released all stemmed from the same course of
conduct engaged in by Farmers. Similarly, the nonrenewal claims that the Hookses contend were
inappropriately released originate from one of the foundations underpinning this lawsuit: Farmers'
decision to begin selling HO-A policies. Regarding Lubin's complaints, we also noted that the
Supreme Court has indicated that class actions resting on permissible claims may also release causes
of action that otherwise could not have been pursued. See Epstein, 516 U.S. at 375, 387. 

 For these same reasons, even assuming that the attorney general may only pursue
claims based on alleged violations of former section 4, we cannot conclude that the district court
abused its discretion by preliminarily approving a proposed settlement that released the nonrenewal
claims, which arguably could not have served as a basis for a class action on their own. Moreover,
as with many of the other issues raised, this argument relates to the fairness of releasing certain
claims, which is an issue not before us. See McAllen Med. Ctr., Inc., 66 S.W.3d at 234. 

 Alternatively, the Hookses contend that the settlement is improper because it
exceeded the scope of the matters referred to the attorney general by the Commissioner. In other
words, the Hookses insist that because settlement class actions require heightened scrutiny, see id.
at 232, proposed settlement class actions pursued under the former insurance code provisions must
be limited to the matters specifically referred to the attorney general by the Commissioner. Because
the letter sent by the Commissioner requesting the attorney general to file this class action did not
mention nonrenewal claims and because none of the common questions listed in the attorney
general's amended petition address nonrenewal claims, the Hookses contend that the proposed
settlement exceeds the scope of the authorized class action by releasing claims that the attorney
general was not authorized to pursue. (50) 

 It is true that heightened scrutiny is used when reviewing settlement class actions in
order to protect absent class members. Id. at 232. That heightened scrutiny is applied to a
determination of whether the necessary statutory class-action requirements (e.g., typicality, adequacy,
and predominance) have been satisfied, and we can see no reason to conclude that the level of
scrutiny applied to certification prerequisites has any limiting effect on or applicability to a request
by the Commissioner asking the attorney general to file a class action. Moreover, the language of
former section 17 does not impose a requirement that the Commissioner or the Department set out
the entire scope of a class action before the attorney general may initiate the class action. In fact,
other than requiring that a request be submitted to the attorney general, former section 17 imposes
no direct obligation on the Commissioner or the Department as a prerequisite to filing a class action. 
In addition, we note that the reasons discussed previously that serve as support for a decision to
certify a class that sought to release claims not specifically identified in former section 4 would also
seem to apply to a decision to approve a class action that sought to release claims not specifically
identified in the Commissioner's request. In other words, the enumeration of specific causes of
action in a letter by the Commissioner would not seem to foreclose the possibility that other claims
may be released through the settlement process. In light of the preceding, we cannot conclude that
the district court abused its discretion by certifying a settlement class action that sought, among other
things, to release certain claims that were not specifically identified by the Commissioner prior to
the class action being filed. 

 For these reasons, we overrule the Hookses' third issue on appeal. 


Impact on the Geter Class

 In their final issue, the Hookses contend that the district court failed to adequately
consider the fact that the proposed settlement would effectively extinguish all of the renewal claims
forming the basis for the Geter class action. In making this assertion, the Hookses refer to testimony
indicating that the attorney general had no knowledge of the Geter class action at the time when the
proposed settlement was submitted for preliminary approval and stating that the proposed settlement
provided no compensation for the release of the nonrenewal claims pursued by the Geter class. (51) 
Further, the Hookses state that they filed their plea in intervention less than a week before the
hearing because they only found out about the certification hearing shortly before the hearing. (52) 
Moreover, they assert that their plea was filed after the time allotments had been decided and
consequently were given little time to argue their case or to present evidence and were not allowed
to make closing arguments. In particular, the Hookses claim that they were not given an opportunity
to ask the attorney general's witnesses about the decision to release the nonrenewal and other claims
through the settlement. For all these reasons, the Hookses contend that the district court could not
and did not fully consider the impact that settling this class action will have on the Geter class action. 

 As a preliminary matter, we note that the district court expressed its confusion
regarding why the Hookses delayed becoming involved in this case until right before the certification
hearing, particularly in light of the fact that the proposed class action in this case had "been
publicized throughout the [S]tate." Further, although it appears from the record that the Hookses'
notice of intervention was filed shortly before the certification hearing and that the Hookses had a
relatively minor role during the certification hearing, our review of the record has failed to identify
a specific objection made by the Hookses regarding the fairness of the certification hearing. Cf. Hall,
278 S.W.3d at 542 (explaining that failure to make specific objection waives complaint). In fact,
at the end of the hearing, the district court asked whether "everyone has now offered all the evidence
they intend to offer," and the Hookses answered affirmatively. 

 Regardless, although the record reveals that the Hookses were not allotted a great deal
of time in the hearing, the Hookses accepted the amount that they were given and stated that they
would use their "time most judiciously, as little as humanely possible." Furthermore, the Hookses
actively participated in the hearing, gave an opening statement, cross-examined witnesses, and
presented evidence. Although the Hookses did not provide a closing statement, a joint closing
statement on behalf of all of the Policyholders was given. In addition, the Hookses' motion to
intervene summarized the basis for their nonrenewal claims and detailed the relief that they sought
from the district court. 

 Moreover, given that the focus of the preliminary hearing in this case mostly
concerned whether the requirements for certification had been met, the Hookses' complaint that they
were unable to introduce enough evidence or testimony regarding the impact of the settlement on
the nonrenewal claims in the Geter class action goes to the fairness of the settlement, which will be
addressed in a subsequent hearing and which is not properly before us. See McAllen Med. Ctr., Inc.,
66 S.W.3d at 234. 

 For these reasons, we overrule the Hookses' final issue on appeal. 


CONCLUSION

 Having overruled all of the Policyholders' issues on appeal, we affirm the district
court's certification order. 


 

 David Puryear, Justice

Before Chief Justice Jones and Justices Puryear and Henson

Affirmed on Remand

Filed: November 6, 2009
1. At the time of certification, the relevant insurance provisions at issue in this case
were found in former articles 21.21, 21.21-6, and 21.21-8 of the insurance code. See Act of
April 25, 1957, 55th Leg., R.S., ch. 198, 1957 Tex. Gen. Laws 401, 401, amended by Act of
May 10, 1973, 63rd Leg., R.S., ch. 143, § 2, 1973 Tex. Gen. Laws 322, 335 ("former Tex. Ins. Code
art. 21.21"); Act of May 29, 1995, 74th Leg., R.S., ch. 415, § 1, 1995 Tex. Gen. Laws 3005, 3005
("former Tex. Ins. Code art. 21.21-6"); Act of May 17, 1995, 74th Leg., R.S., ch. 414, § 16, 1995
Tex. Gen. Laws 2988, 3002 ("former Tex. Ins. Code art. 21.21-8"). After the class was certified, the
legislature repealed those insurance code provisions and enacted new provisions incorporating the
content of the repealed provisions. See Act of May 20, 2003, 78th Leg., R.S., ch. 1274, §§ 2,
26(a)(1), 26(a)(10), 2003 Tex. Gen. Laws 3611, 3641, 4138; see also Tex. Ins. Code Ann.
§§ 541.001-.454 (replacing former article 21.21), 544.001-.204 (replacing former article 21.21-6),
544.051-.054 (replacing former article 21.21-8) (West 2009). Because some of the language in the
new provisions differs from the language in the former articles and because many of the arguments
made in the parties' briefs are tied to the language found in the former articles, we will generally
refer to the former insurance code provisions. 
2. These same requirements are listed in rule 42 of the rules of civil procedure. See Tex. R.
Civ. P. 42(a), (b). For ease of reading and because the requirements are the same, we will generally
refer only to the former insurance code provisions. 
3. There are two sets of appellees in this case. The first set is composed of the following
eleven related or associated insurance providers: Farmers Group, Inc., Farmers Underwriters
Association, Fire Underwriters Association, Farmers Insurance Exchange, Fire Insurance Exchange,
Texas Farmers Insurance Company, Mid-Century Insurance Company of Texas, Mid-Century
Insurance Company, Truck Insurance Exchange, Truck Underwriters Association, and Farmers
Texas County Mutual Insurance Company. We will refer to that set of appellees collectively as
"Farmers." The second set is composed of the State, the Department, and the Commissioner of
Insurance. When discussing this set of appellees jointly, we will generally refer to them as the
attorney general. 
4. Originally, the suit was brought not as a class action but "in the name of the State of Texas
and on behalf of the Texas Commissioner of Insurance" against Farmers for "deceptive, misleading,
and discriminatory homeowners-insurance practices" in violation of the insurance code and the
Deceptive Trade Practices Act. See Tex. Bus. & Com. Code Ann. §§ 17.41-.63 (West 2002 & Supp.
2008) ("Deceptive Trade Practices-Consumer Protection Act"). 
5. As will be discussed later, Farmers also assigned its automobile policyholders to risk-assessment categories based, in part, on their credit histories when determining automobile insurance
premiums. 
6. Jeff Boyd, an employee for the attorney general's office, explained that the attorney general
challenged Farmers' automobile insurance practices after he discovered that Farmers was misusing
its automobile policyholders' credit information in the same manner that it had misused its
homeowners policyholders' credit information. 
7. The Memorandum was amended several times and was amended after the certification
hearing to address some concerns expressed by the district court during the hearing. In this opinion,
we will refer to the contents of the most recent agreement. 
8. The Memorandum defined "Settlement Classes" as follows:


(1) all of [Farmers'] Texas homeowners insurance policyholders (a) whose
homeowners insurance policies incepted (including renewals) from
December 28, 2001, through and including December 27, 2002, or (b) who received
a notice at any time after November 14, 2001, that their HO-B policy would not be
renewed (the "Rate Class"); (2) all of [Farmers'] homeowners insurance
policyholders who according to Farmers records were eligible to receive discounts
for [Farmers Property Risk Assessment], age of home, or territory from
November 16, 2000, through and including December 10, 2002 (the "Discount
Class"); and (3) all Texas homeowners or automobile insurance policyholders of
[Farmers] who according to Farmers records were provided or should have been
provided a Credit Usage Notice from October 1, 1999, through February 28, 2003
(the "Credit Usage Notice Class"). 


 The Memorandum also defined "credit usage notice" as "notice of adverse action under the
Fair Credit Reporting Act." It is worth noting that Farmers also agreed to revise their credit-scoring
notices, which are supposed to be sent to policyholders when their premiums increased due to their
credit histories. 
9. The attorney general later filed a second amended petition making the same substantive
allegations. 
10. Alternatively, in his petition, the attorney general alleged that this class action was also
proper under the doctrine of parens patriae. See Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel.
Barez, 458 U.S. 592, 601-02 (1982) (explaining doctrine of parens patriae as ability of state to
pursue claims affecting well-being of its populace). In particular, the attorney general alleged that
by drafting the various insurance code provisions at issue, the legislature provided a "classic grant
of statutory parens patriae authority to the Attorney General to protect the interests of Texas
insureds." For this reason, the attorney general asserted that it was unnecessary for him to comply
with all of the class-action requirements listed in the insurance code and in the rules of civil
procedure. 


 In its order, the district court made two alternative determinations. First, it concluded that
the attorney general could "fulfill the role of the Settlement Classes' Counsel" by virtue of the
parens patriae doctrine. Alternatively, it concluded that even if the attorney general had to comply
with all of the various prerequisites listed in the insurance code, those requirements had been met. 


 In our first opinion, we concluded that the former insurance code provisions did not bestow
parens patriae authority on the attorney general. Lubin I, 157 S.W.3d at 122-23. The supreme court
affirmed that determination and declined "to import [the doctrine] into the Insurance Code." Lubin
II, 222 S.W.3d at 423-24. Accordingly, on remand, we need not revisit the arguments pertaining to
that doctrine. 
11. Villanueva filed his class action in 2000 and asserted that various companies had engaged
in discriminatory practices regarding its automobile insurance policies. See former Tex. Ins. Code
art. 21.21-8 (prohibiting insurers from unfairly discriminating "between individuals of the same class
and of essentially the same hazard"). Essentially, Villanueva asserted that the insurance companies
were improperly using their policyholders' credit information when determining premiums, which
resulted in policyholders paying excessive premiums. Paladino filed his class action in 2002. In that
case, Paladino made allegations that were similar to the ones made by Villanueva. 
12. It is worth noting that during the certification hearing, Lubin argued that the proposed
settlement was the result of collusion between Farmers, the attorney general, and other State
officials. In its order, the district court found "that there has been no collusion between the State and
[Farmers] with respect to negotiating the" proposed settlement. None of the Policyholders have
appealed that determination. 
13. In particular, the court determined as follows: 


[E]ach of those requirements has been met, specifically: (a) each of the Settlement
Classes is so numerous that joinder of all members is impracticable; (b) there are
questions of law or fact common to the Settlement Classes which predominate over
any individual questions; (c) the claims or defenses brought by the State on behalf of
Farmers' policyholders are typical of the claims or defenses of the Settlement Classes
and the State is authorized to bring claims on behalf of the Settlement Classes; (d)
in negotiating and entering into the Settlement Agreement, the State has fairly and
adequately represented and protected the interests of the Settlement Classes; (e) the
questions of law or fact common to the Settlement Classes predominate over any
questions affecting only individual members; and (f) certifying this Action as a class
action is superior to other available methods for the fair and efficient adjudication of
the controversy. 
14. During the hearing, Professor Samuel Issacharoff testified as an expert on class actions,
and the district court explained that it relied heavily on his testimony when making its decision. For
that reason, we will refer to his testimony with some frequency in this opinion. 
15. Although we apply heightened scrutiny in this case, we note that many of the justifications
requiring heightened scrutiny in traditional settlement class actions would not seem to be present in
a class action pursued by the attorney general. For example, the supreme court has stated that
settlement class actions provide a greater opportunity for attorneys to pursue their own interests at
the expense of the class and to obtain large legal fees but settle the class claims for small amounts.
General Motors Corp. v. Bloyed, 916 S.W.2d 949, 953-54 (Tex. 1996) (citing Jonathan R. Macey &
Geoffrey P. Miller, The Plaintiffs' Attorney's Role in Class Action and Derivative Litigation, 58 U.
Chi. L. Rev. 1, 7-8 n.4 (1991) and Richard A. Posner, An Economic Analysis of Law 570 (4th ed.
1992)). Similarly, the supreme court has explained that in settlement class actions there is a greater
potential for class representatives and counsel "to ignore differences among class members, or even
collude with defendants at absent class members' expense." McAllen Med. Ctr., Inc. v. Cortez,
66 S.W.3d 227, 233 (Tex. 2001).


 The lack of a specific class representative, the attorney general's role as an elected official
answerable to the public, and his inability to seek personal monetary compensation for his
representation in a class action would seem to foreclose the potential conflicts identified by the
supreme court. Moreover, although the settlement in this case does authorize an award for attorney's
fees, that award was less than two percent of the estimated value of the award and will be paid to the
State, not the attorney general himself. 
16. In his testimony, Professor Issacharoff stated that the typicality element is often subsumed
within the adequacy analysis. 
17. We note that in a typical class-action context, courts evaluate whether there is a nexus
between the injuries alleged by the class representatives and those of absent class members. See
Employers Cas. Co. v. Texas Ass'n of Sch. Bds. Workers' Comp. Self Ins. Fund, 886 S.W.2d 470,
475 (Tex. App.--Austin 1994, writ dism'd w.o.j.). Although the representatives' injuries do not
have to be identical to the injuries of the class, the presented claims must be based on the same legal
theories and must originate from the same course of conduct or event. Weatherly v. Deloitte
& Touche, 905 S.W.2d 642, 653 (Tex. App.--Houston [14th Dist.] 1995, writ dism'd w.o.j.). As
mentioned earlier, the type of class action at issue in this case does not require a class representative. 
Because no class representative has been appointed, this type of comparison is not possible, and this
class action is being pursued on behalf of all of the "absent" class members. 


 However, the supreme court determined that in this type of class action, the certification
requirements must be generally applied to the claims asserted by the attorney general. Lubin II,
222 S.W.3d at 420. In this settlement class action, the attorney general alleged that the members of
the various subclasses were injured by the same conduct, particularly by Farmers' decision
to discontinue its HO-B polices and to offer HO-A policies instead and by the methods Farmers used
to calculate premiums. For example, regarding the Rate Class, the attorney general alleged that the
current and former HO-A policyholders were universally charged too much for the coverage
provided. Similarly, regarding the Discount Class, the attorney general argued that Farmers'
methods for determining premiums resulted in discriminatory rates. Finally, regarding the Credit
Usage Notice Class, the attorney general contended that Farmers universally failed to inform the
members of this subclass when the use of their credit histories resulted in adverse action (e.g.,
increased premiums) being taken against them. Accordingly, the claims presented were typical of
the various subclasses. Although the Policyholders insist that other claims should have been pursued
and not released under the proposed settlement, those arguments do not seem to pertain to a
determination regarding whether the claims pursued by the attorney general were typical of the
subclasses and, in any event, these arguments will be addressed later in this opinion. 
18. We note that the attorney general originally estimated that Farmers was charging rates that
were approximately 12 to 18 percent too high. However, in a letter describing the settlement, David
Mattax, a division chief for the attorney general, admitted that more recent data "suggests that 12%"
was a more accurate estimate. A similar explanation was provided by Karina Casari, who was the
executive deputy commissioner for the Department at the time of the settlement negotiations and
who played a key role in those negotiations. Moreover, although we do not decide the fairness issue
here, we note that during the certification hearing, the attorney general explained that Farmers would
not have paid for additional recovery and that "given the vagaries of litigation," he believed that the
recovery obtained through the settlement was fair. Similarly, Professor Issacharoff testified that due
to the nature of class actions, they generally settle for less than originally requested. 
19. As support for the assertion that there is a fatal conflict, Lubin cites to E & V Slack, Inc. v.
Shell Oil Co., 969 S.W.2d 565 (Tex. App.--Austin 1998, no pet.). That case involved a class action
filed against Shell by former fuel-station operators. In that case, former fuel-station operators who
purchased gasoline from Shell sued Shell. Id. at 566. As part of its sales agreement, Shell allowed
operators to take part in a voluntary program that would reduce their rent if they were able to sell
certain amounts of fuel. The former operators filed a class action on behalf of all of the past and
present operators and asserted that Shell used the program formula to impose additional costs on
operators. The trial court denied the certification, and this Court affirmed that decision after
concluding that there was a conflict in the class that defeated certification. Specifically, we noted
that there was a conflict between the former operators pursuing the class action and some of the
current operators who were also included in the class. The former operators wanted to dissolve the
program, and one of them had begun directly competing with Shell. The current operators, however,
did not want the class action to be certified because it would damage Shell's reputation and did not
want the program discontinued because they benefitted from it. Id. at 568-69. In light of this case,
Lubin contends that this Court should reverse the district court's certification because there is an
allegedly similar conflict.


 We disagree. The conflicts present in Shell and alleged in this case are very dissimilar. In
Shell, one of the conflicts that led to the denial of the class certification was the fact that one of the
class representatives was now operating a business that directly competed with Shell and, therefore,
had different financial motivations than those individuals who still had operating agreements with
Shell. Further, the record in Shell showed that some members of the class had interests that were
actually in conflict with the continuation of the class action. 
20. When asserting that there exists intra-class conflict, Lubin also refers to Phillips Petroleum
Co. v. Bowden, 108 S.W.3d 385 (Tex. App.--Houston [14th Dist.] 2003), rev'd in part, 247 S.W.3d
690 (Tex. 2008). In that case, several gas royalty owners initiated a class action against Phillips and
asserted that Phillips was not paying the full royalties owed. The class action was divided into three
subclasses. The appellate court determined that the adequacy requirement was not met because the
suit was challenging the manner in which the royalty payments were calculated and because the
alternative method urged by the class would result in some class members receiving smaller royalties
than what they were being paid under the challenged method. Id. at 399-400 (stating that "a class
action cannot be maintained when the class members have opposing interests or when it includes
members who benefit from the same acts alleged to be harmful to other class members"). 


 The portion of the case relied on by Lubin was reversed by the supreme court some time after
the case at issue was remanded to this Court. Specifically, the supreme court determined that the
royalty agreements did not actually allow for the deductions Phillips asserted would have resulted
in some members being paid less than they were currently receiving. Bowden v. Phillips Petroleum
Co., 247 S.W.3d 690, 707 (Tex. 2008) ("Bowden II"). Accordingly, the supreme court reversed the
appellate court's determination that the adequacy element had not been satisfied. Id. In light of that
reversal, we do not believe that the reasoning of the appellate decision compels a conclusion that the
district court in this case abused its discretion. 
21. We acknowledge that the class could arguably have been defined in a manner that would
have excluded individuals who will be paying more if the settlement is approved and thereby remove
this particular challenge to certification. However, excluding those individuals would have led to
the same result regarding the new discounts because the excluded individuals would not be required
to refund any benefit that they received but would still have to pay more after the class action due
to Farmers' decision to apply the new method for calculating discounts to future policies. 
22. Lubin insists that the credit-reporting, discrimination, and management-fee claims had
potential values that exceeded the total value of the proposed settlement agreement. See 15 U.S.C.A.
§ 1681n (West 1998 & Supp. 2009) (stating that person who wilfully violates credit reporting act is
liable for actual damages or "damages of not less than $100 and not more than $1,000"); former Tex.
Ins. Code art. 21.21-8, § 3(b)(1) (allowing person who has been subject of discriminatory practice
to obtain civil penalty up to $25,000 if discriminatory action was committed "knowingly"). 
23. Although we need not decide the matter here, we do note that evidence was presented
during the certification hearing suggesting that the premium-rate reductions formulated under the
proposed settlement will also lead to a reduction in the management fees that Farmers charges
because those fees are determined by the amount of premium collected. 
24. We note that when the supreme court remanded this case back to this Court, it suggested
that the attorney general's decision to forgo certain claims did not render his representation
inadequate. In particular, the court noted that the former insurance code provisions gave precedence
to administrative class actions, which only allowed for the recovery of premium refunds, over other
types of class actions and surmised that the legislature's decision to elevate administrative class
actions "suggests that attorneys general are not inadequate representatives merely because a private
litigant might demand more." Lubin II, 222 S.W.3d at 426.


 Further, although we do not reach the fairness issue here, we note that in the court below and
on appeal, Farmers identified several defenses to many of the released claims that it alleged would
have prohibited Farmers from being held liable for those claims. When discussing the defenses to
the credit-reporting claim, the district court stated that "there is a good . . . defense that Farmers has
that potentially . . . eliminates the cause of action advanced." 
25. In a related point, Lubin asserts that Farmers coerced the attorney general "into converting
his enforcement action into a settlement class" and that the attorney general simply agreed to release
all of the claims of the policyholders due to pressure from Farmers. As support for this assertion,
Lubin points to a provision in a prior version of the proposed settlement that stated that the attorney
general's lawsuit was switched to a class action for the benefit of Farmers. 


 Even assuming that Farmers was the driving force behind the decision to transform this
lawsuit into a class action, that fact alone would not render the attorney general's representation of
the class inadequate. Additionally, as will be more thoroughly discussed later, there was evidence
that the attorney general and the Department were not coerced into settling their various lawsuits
through a settlement class action. In fact, the evidence shows that they were willing to allow
Farmers to leave the Texas market rather than settle the various lawsuits on terms that they believed
were unfavorable to the policyholders. Moreover, the attorney general repeatedly informed Farmers
that he was not going to accept a proposed settlement that did not include restitution for injured
policyholders in addition to rate reductions. In light of this evidence, we cannot conclude that the
district court abused its discretion by failing to conclude that a provision in an earlier version of the
settlement agreement, which documented Farmers' desire to settle the claims through a class action,
showed that the adequacy requirement was not met in this case. 
26. After this case was remanded, Lubin filed a post-submission letter brief noting subsequent
class actions that have been filed in other states since this case was originally appealed. In particular,
Lubin refers to several class-action suits filed against Farmers that included claims similar to the
ones abandoned by the attorney general in this case, including excessive management-fees claims
and alleged violations of the Fair Credit Reporting Act. See, e.g., Fogel v. Farmers Group, Inc.,
74 Cal. Rptr. 3d 61 (Cal. Ct. App. 2d Dist. 2008) (dealing with excessive fees). In light of these
class actions, Lubin contends that the abandoned claims are valuable and that the attorney general's
decision to abandon them undermines the district court's determination that the adequacy and
typicality elements were met in this case. 


 In addition to her post-submission letter briefs, Lubin also filed a motion asking this Court
to remand the case to the district court instead of addressing the merits of the issues on appeal. In
particular, Lubin argues that the district court should be given the opportunity to revisit its
certification determination in light of the supreme court's holding in Lubin II. Further, Lubin
comments that "the landscape informing the trial court's" prior determination "has changed
significantly" and, as support for that assertion, points to a federal class action that was filed against
Farmers after the district court originally certified the class in this case. The federal case concerns
allegations that Farmers violated the Fair Credit Reporting Act, and Lubin asserts that the district
court should be given the opportunity to "consider the prospect that approval of the class settlement
[in this case] would interfere with the federal court's jurisdiction and violate" the federal rules of
civil procedure. 


 In determining whether the district court abused its discretion, we are necessarily limited to
the record that was before the district court at the time of certification. In this case, the district court
considered the preclusive effect of abandoning the claims asserted by Lubin. See Bowden II,
247 S.W.3d at 698 (requiring trial courts to "assess the [certification] requirements in light of res
judicata's preclusive effect on abandoned claims when considering whether to certify a class"); see
also Citizens Ins. Co. of Am. v. Daccach, 217 S.W.3d 430, 448 (Tex. 2007) (concluding that trial
court abused its discretion by certifying class without considering adequacy of class representative
in light of res judicata effect on decision to abandon claims). Nothing in the record persuades us that
the district court abused its discretion by certifying the class in light of the abandoned claims. 
However, nothing in our opinion should be read as foreclosing the trial court from considering these
subsequent developments or from modifying its certification order in light of those developments. 
See Tex. R. Civ. P. 42(c)(1)(C) (explaining that trial court may alter or amend its certification order
"before final judgment"); see also Bailey v. Kemper Cas. Ins. Co., 83 S.W.3d 840, 848
(Tex. App.--Texarkana 2002, pet. dism'd w.o.j.) (noting that trial courts have responsibility to
respond to changes that occur throughout pendency of case). Similarly, although we overrule
Lubin's motion to remand the case, that determination should not be read as precluding the district
court from considering the arguments raised in Lubin's motion should Lubin raise them before the
district court. 
27. As previously mentioned, the propriety of the attorney general's decision to not seek
statutory penalties is more germane to a fairness hearing than a certification hearing. However, we
do note that the supreme court determination that an attorney general's duty to all of the citizens of
Texas does not render his representation inadequate, Lubin II, 222 S.W.3d at 426, would seem to
have some applicability to the attorney general's decision to propose and obtain a settlement that
limits recovery to damages that the class members actually sustained rather than pursuing more
exacting monetary penalties. In other words, even if the attorney general chose not to pursue
statutory penalties in order to protect the Texas citizenry from the possibility that Farmers might
leave the Texas insurance market, this decision would not seem to automatically render his
representation inadequate. We further note that Professor Issacharoff testified that statutory penalties
generally have no applicability in class actions even when the statutes contain mandatory language
because the number of people involved would result in inappropriately excessive penalties. 
28. In his testimony, Professor Issacharoff indicated that the inability to determine a precise
recovery amount is not unusual in class actions. Specifically, he stated that in most class actions it
is not possible to inform class members how much they will be recovering before settlement because
the amount ultimately recovered will be reduced on a pro rata basis. However, unlike typical class
actions, the proposed settlement in this case provides a guaranteed recovery that will not be reduced
depending on the number of class members that participate in the class action. 
29. Professor Issacharoff also testified that when evaluating a settlement, the class counsel
should estimate the value of the claims released by the settlement. 
30. During her testimony, Casari explained that the Department was heavily involved in the
settlement process. 
31. It is worth noting that after discussing the amount of recovery obtained for each of the
subclasses and potential defenses to the released claims, the district court stated, "I do not think
either the private plaintiffs or the State bear much likelihood of getting a better result even with a
trial." 
32. Regarding the opt-out provisions, Professor Issacharoff testified that it was unusual for
class-action settlements to allow individuals other than defendants to discontinue the settlement
process. Further, he testified that the opt-out provision affords class members additional protection
by letting them decide whether to pursue their own individual claims. 
33. During the certification hearing, Professor Issacharoff stated that the cease-and-desist
order was crucial to forcing the settlement and that it gave the attorney general additional leverage. 
 
34. In addition to potential conflicts and vigorous advocacy, courts have identified other
factors to consider in more traditional class actions when determining whether the typicality and
adequacy prerequisites have been met. For example, courts may consider the personal integrity of
the plaintiffs, any geographical limitations affecting the manageability of the class, and whether the
plaintiffs can afford to finance the case. See Farmers Ins. Exch. v. Leonard, 125 S.W.3d 55, 67
(Tex. App.--Austin 2003, pet. denied); Forsyth v. Lake LBJ Inv. Corp., 903 S.W.2d 146, 150
(Tex. App.--Austin 1995, writ dism'd w.o.j.). However, because this case was filed by the attorney
general without class representatives and is a settlement class action, these factors have no
applicability here. 
35. In a related assertion, Lubin argues that because the attorney general was pursuing claims
that could not permissibly be certified, the attorney general had little if any bargaining power, which
according to Lubin led to a one-sided settlement dramatically in favor of Farmers. For reasons
discussed previously, it would be premature to comment on the fairness of the proposed settlement
in this case, but we do note that the reasoning supporting our ultimate determination that the district
court did not abuse its discretion by concluding that the typicality and adequacy requirements were
satisfied would also seem to support a determination that the district court did not abuse its
discretion by failing to conclude that the attorney general was rendered ineffectual by a weak
bargaining position. 
36. Under the agreement, the Department was charged with the task of verifying that Farmers
accurately calculates the class members' awards. 
37. In her briefs, Lubin also refers to the letter sent by the Commissioner asking the attorney
general to initiate this class action. In that letter, the Commissioner listed questions that the class
action "should address." Because the common questions are similar to those listed in the second
amended petition, we will limit our discussion to the allegations made in the petition. 
38. In particular, the attorney general alleged that Farmers used "a catastrophe load factor" and
"excessive target rate of return, excessive trend factors[,] and an excessive length of trending
periods." During the settlement hearing, the attorney general explained that the catastrophe load and
trend factors as well as the collection of management fees all formed part of the basis for his
assertion that the HO-A policy premiums were excessive. 
39. The other actions constituting "unfair methods of competition and unfair and deceptive
acts or practices in the business of insurance" under former section 4 can generally be described as
follows: 


(1) making or using statements in advertisements that misrepresent the terms of an
insurance policy, the benefits given under a policy, the financial condition of an
insurer, or the type of insurance provided by a policy;


(2) using or making an advertisement containing a statement relating to insurance
that is untrue, deceptive, or misleading;


(3) making or using statements that are (i) false or (ii) defame the financial condition
of insurer and are designed to injure a person engaged in insurance business;


. . . 


(5) filing or making false statements regarding the financial condition of an insurer
or entering false information into records for the purpose of deceiving individuals
reviewing those records;


(6) issuing stocks or other benefits to induce the sale of insurance;


(7) charging individuals of the same class and "expectation of life" different rates for
life insurance;


(8) inducing the sale of an insurance policy by offering rebate or other advantage or
inducing the sale by offering to buy or sell stocks or other securities;


(9) using a name or symbol for an insurance company that is the same or deceptively
similar to the name used by another insurance company; and


(10) engaging in unfair settlement practices with regard to claim by insured. 


Former Tex. Ins. Code art. 21.21, § 4.
40. In his testimony, Professor Issacharoff stated that releases originating from the same
transactions as the initial complaint are presumptively valid. 
41. It is worth noting that the district court certified the class in this case and preliminarily
approved the settlement shortly before the Geter class action was originally certified in August 2003. 
In addition, although the Geter class certification was initially reversed on appeal and remanded to
the district court, Farmers Group Inc. v. Geter, Nos. 09-03-00404-CV, 09-03-00396-CV, 2004 Tex.
App. LEXIS 9364, at *29-30 (Tex. App.--Beaumont Oct. 21, 2004, no pet.) (mem. op.), the district
court recertified the class on remand, and that certification was upheld on appeal, Farmers Group
Inc. v. Geter, No. 09-05-00386-CV, 2007 Tex. App. LEXIS 5867, at *16 (Tex. App.--Beaumont
July 26, 2007, pet. denied) (mem. op.). 
42. The Hookses estimate that the alleged settlement gap is composed of 100,000 or more
former policyholders based on the number of HO-A policies that were sold after Farmers elected to
discontinue providing HO-B policies. 
43. As support for this proposition, the Hookses refer to testimony indicating that "a very large
portion" of the Discount Class will receive no benefit under the proposed settlement. 
44. Although we do not reach the issue here, we note that the State and Farmers provided
extensive briefing regarding why they believed that the nonrenewal claims are without merit and,
therefore, properly released. Moreover, both Farmers and the State referred to testimony by the
Commissioner indicating that he had extensively researched the nonrenewal issue and that it was his
belief that nothing in the governing statutes or the HO-B policies issued by Farmers prohibited it
from discontinuing that type of coverage. 
45. We note that it is not entirely clear that the adequacy of the notice is an issue that should
be considered at this preliminary stage. Cf. Northrup v. Southwestern Bell Tel. Co., 72 S.W.3d 16,
19-21 (Tex. App.--Corpus Christi 2003, pet. denied) (addressing propriety of notice after trial court
had approved proposed settlement). Moreover, it appears from the record that the Hookses did not
object to the notice on the grounds alleged on appeal. See Hall v. Pedernales Elec. Coop., Inc.,
278 S.W.3d 536, 542 (Tex. App.--Austin 2009, no pet.) (explaining that in class actions, class
objector must make objections himself in order to prevent waiver). However, in light of the supreme
court's directive to address the "notice" issue, see Lubin II, 222 S.W.3d at 427-28, and because we
have found no cases prohibiting a court from considering the adequacy of a notice as part of the
initial certification of the class, we will address this claim in the interests of justice. 
46. The Hookses also contend that in class actions pursued by the attorney general, it is even
more important for a proposed notice to disclose all of the material terms of a proposed settlement
because the class members are more likely to believe that the attorney general is acting in their best
interests. However, we have found no authority for the proposition that notices prepared as part of
a class action pursued by the attorney general should be subject to higher scrutiny than notices
prepared as part of a private class action. 
47. In their briefs, the Hookses also contend that the class notice is faulty because it does not
mention that there are caps to the potential recovery for the Discount Class and the Credit Usage
Notice Class and because it does not delineate that the State may recover more than $2 million if the
monetary caps are not reached. However, the terms that the Hookses are referring to were found in
the initial proposed settlement and were not incorporated into the amended settlement agreement. 
In fact, the amended settlement guarantees 100% recovery for individuals in the Discount Class and
the Credit Usage Notice Class and does not authorize the State to recover any compensation as part
of the settlement other than the $2 million in fees and expenses discussed earlier. Moreover, as will
be discussed more thoroughly later, the notice does disclose that the State will be receiving the $2
million award. 
48. It is worth noting that under the terms of the proposed settlement, a summary of the notice
will be posted on the attorney general's, the Department's, and Farmers' websites. Professor
Issacharoff testified that internet publication was particularly effective in homeowners insurance
cases because there is less risk that this type of notification was elected in order to take advantage
of people without access to computers. 
49. As support for this assertion, the Hookses refer to testimony by the Commissioner stating
that after performing an investigation, he concluded that Farmers' decision to stop offering HO-B
policies did not violate any insurance code provisions. Further, the Hookses point to the portion of
Casari's testimony in which she stated that the Department did not have the regulatory authority to
prevent Farmers from discontinuing its HO-B policies. 
50. In their reply brief, the Hookses complain that this class action is improper because by
agreeing to release the nonrenewal claims, the attorney general has taken a position hostile to the
interests of the members of the Geter class, who are the same individuals making up the Rate Class
in this case. In addition, the Hookses argue that the release is improper due to the merits of their
nonrenewal claims. Previously we determined that arguments regarding the decision to release
certain claims through the proposed settlement and the merits of those claims went to the fairness
of the proposed settlement, which is an issue we are not confronted with in this appeal. For the
reasons previously discussed, we also believe that the Hookses' arguments regarding the merits of
the nonrenewal claims and their release are beyond the scope of this appeal. See McAllen Med. Ctr.,
Inc., 66 S.W.3d at 234. Moreover, although we do not reach the issue here, we note that the
proposed settlement in this case provides some type of recovery to most of the Geter class members
through prospective and retrospective reductions to HO-A premiums and possibly through the
additional recovery provided to the Discount Class and the Credit Notice Usage Class. 
51. The testimony referred to revealed that the objective of the settlement was to provide
restitution for individuals who had paid excess premiums, had been the victim of discriminatory
practices, or had not received notice that their premiums were increased due to their credit histories. 
52. The Hookses further contend that although Farmers was a party to the Geter class action
and, therefore, knew of its existence, no party informed the Hookses about the certification
proceeding occurring in this case.